A&H SPORTSWEAR CO., INC. and Mainstream Swimsuits, Inc., Plaintiffs and Counterclaim–Defendants,

v.

VICTORIA'S SECRET STORES, INC. and Victoria's Secret Catalogue, Inc., Defendants and Counterclaim–Plaintiffs.

Civil Action No. 94–7408.

United States District Court,
E.D. Pennsylvania.

May 24, 1996.

Arthur H. Seidel, Stephen J. Meyers, Ronald N. Weikers, Philadelphia, PA, Norman Seidel, Easton, PA, for plaintiffs.

Frank J. Colucci, Richard P. Jacobson, New York City, H. Robert Fiebach, Julie Merritt Pacaro, Cozen and O'Conner, Philadelphia, PA, for defendants.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

This action arises under the common law, Sections 32 and 43(a) of the Trademark Act of 1946 (the Lanham Act), 15 U.S.C. §§ 1114, 1125(a), and the Pennsylvania Antidilution Law, 54 Pa.C.S.A. § 1124. The parties are diverse in citizenship and the amount in controversy exceeds $50,000 exclusive of interests and costs. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 1338 and 1367. Venue in this court is proper under 28 U.S.C. § 1391. Plaintiffs have chosen to bring this action directly in District Court pursuant to 28 U.S.C. § 1338 rather than through the adjudication process of the Patent and Trademark Office. On December ·8, 1994, A & H Sportswear filed their complaint alleging trademark infringement of their MIRACLESUIT trademark by Defendants' THE MIRACLE BRA and THE MIRACLE BRA line of products. Pursuant to a telephone conference of June 13, 1995

and an order of June 15, 1995, the parties agreed to consolidate a hearing on a preliminary injunction with a trial on the merits. We deemed letters from counsel a stipulation waiving a jury trial in our order of July 31, 1995. In our order of October 20, 1995, we granted Defendants' motion for separate trials on the issues of liability and damages. A two-week non-jury civil trial to determine issues of liability was conducted from October 25 to November 3, 1995. Due to its commercially sensitive nature, numerous papers were filed under seal and three segments of confidential testimony were received during trial. Pursuant to F.R.Civ.P. 52(a) we make the following findings [1] of fact:

## II. FINDINGS OF FACT

### A. PARTIES AND PRODUCTS

1. Plaintiff A & H Sportswear, Co., Inc. ("A & H") is a corporation organized and existing under the laws of Pennsylvania, having a place of business at Routes 191 and 33, Stockertown, Pennsylvania 18083. Exhibit D–231. A & H manufactures women's swimwear, including the MIRACLESUIT swimsuit in issue in this action. M. Waldman, 10/27/95, p. 98:20 to p. 105:7, Exhibits P–53, P–54. A & H's trademark registration, registered October 27, 1992, for MIRACLESUIT covers swimwear in International Class 25, which is a registration category for clothing apparel. B. Waldman, 10/25/95, p. 175:14 to p. 176:14; Exhibit P–1. A & H manufactures four million swimsuits, or approximately ten percent of all swimsuits annually sold in the U.S. B. Waldman, 10/25/95, p. 79:17 to p. 80:1.

2. Mainstream Swimsuits, Inc. ("Mainstream"), is a corporation organized and existing under the laws of the state of Pennsylvania. Exhibit D–229. Mainstream is the exclusive distributor of MIRACLESUIT products manufactured by A & H. Mainstream purchases MIRACLESUIT swimsuits from A & H for which A & H then invoices Mainstream. Mainstream sells MIRACLESUIT swimwear nationwide. Mainstream also maintains a corporate showroom in New York City at which MIRACLESUIT swimsuits and other Mainstream lines are shown to trade customers. B. Waldman, 10/23/95, p. 141:11 to p. 143:19. A & H ships MIRACLESUIT swimsuits directly to Mainstream's customers. B. Waldman, 10/23/95, p. 68:1 to p. 69:7, p. 70:5–17, p. 138:25 to p. 141:9; Exhibits P–25, P–62A & B. SWIM SHAPER is a division of Mainstream swimsuits which was established to market the MIRACLESUIT line. The MIRACLESUIT sales invoices are captioned "MIRACLESUIT™ by SWIM SHAPER™". Retailers and other wholesale purchasers of the MIRACLESUIT make their checks payable to MIRACLESUIT BY SWIM SHAPER or to SWIM SHAPER. A & H and Mainstream (hereinafter referred to collectively as "A & H"), are closely held and owned exclusively by members of the Waldman family. B. Waldman, 10/23/95, p. 64:5 to p. 67:22; Exhibit P–40.

3. The total MIRACLESUIT product line consists of one-piece and two-piece swimsuits with push-up bras, constructed/shaping bras, and unconstructed bras as well as leotards and shorts and non-control cover-ups, dresses, jackets and pareos. B. Waldman, 10/23/95, p. 96:3 to p. 101:22, p. 113:22 to p. 115:23; Exhibits P–4, P–6 and P–7. A & H attaches hang-tags bearing the words "MIRACLESUIT™ by SwimShaper" to its swimsuits. B. Waldman, 10/23/95, p. 88:23 to p. 89:18, Exhibit P–30. MIRACLESUIT currently appears both on A & H's swimsuits' sewn-in labels and on the separate hang tag. Sewn-in labels were first used following this lawsuit's filing. M. Waldman, 10/27/95, p. 137:15 to p. 138:7; Exhibit P–30B.

4. A & H now also sells MIRACLESUIT cover-ups and jackets. B. Waldman, 10/23/95, p. 115:25 to p. 121:14, p. 139:7 to p. 141:2; Exhibit P–8. During the 1993–94 season, A & H offered two styles of jackets, a pareo, a big shirt and a coverup under the MIRACLESUIT name. B. Waldman, 10/26/95, p. 144:18 to p. 145:4; Exhibit P–3D. During the 1995 season, A & H began manufacturing bike shorts, short shorts, a leotard

---

1. All references in the findings of fact are to numbered trial exhibits or to trial depositions and witnesses with the date, page number and lines of their testimony.

and a tank dress under the MIRACLESUIT name. B. Waldman, 10/26/95, p. 145:6 to p. 147:24; Exhibit P–3C. A & H also now sells MIRACLESUIT dresses for which it has received orders from independent sales representatives, Bloomingdale's, and other stores. Sacco, 10/24/95, p. 76:14–17; B. Waldman, 10/27/95, p. 6:3 to p. 7:20; Exhibit D–259; B. Waldman, 10/26/95, p. 191:11 to p. 192:1. Mainstream's independent sales representatives represent the MIRACLESUIT line nationally to the trade for Mainstream. B. Waldman, 10/23/95, p. 141:14 to p. 143:24; Exhibit P–38.

5. Defendant Victoria's Secret Stores, Inc. ("VS Stores"), sells lingerie and swimwear nationwide in retail stores. VS Stores is incorporated in the State of Delaware and is qualified to do business in all states except Arkansas, Hawaii, Montana and South Dakota. VS Stores owns and operates approximately 650 retail stores located nationwide under the name VICTORIA'S SECRET. Most are located in regional malls. Nichols, 10/31/95, p. 117:7–18. VS Stores is headquartered in Columbus, Ohio. The marketing department for VS Stores is located in New York, New York; Nichols, 10/31/95, p. 156:20–22. VS Stores is the dominant specialty retailer of ladies' lingerie in the United States. Nichols, 10/31/95, p. 118:6–7. VS Stores' sales are derived from intimate apparel (85 percent), hosiery (2 percent) and the balance from fragrances and toiletries. Nichols, 10/31/95, p. 118:20–22, 120:16–18; Felder, 11/01/95, p. 132:20–23. VS Stores' total revenue is approximately twice that of VS Catalogue. VS Stores' sales from intimate apparel are roughly five times the comparable sales by Victoria's Secret Catalogue. Fedus, 11/01/95, p. 161:11–14. VS Stores has therefore assumed a primary role in naming apparel. Fedus, 11/01/95, p. 163:24 to 164:2. Bras are VS Stores' number one category of sales. Felder, 11/01/95, p. 91:1–2. The vast majority of VS Stores merchandise bears the VICTORIA'S SECRET trademark and trade name. The remaining items are mostly test merchandise. Nichols, 10/31/95, p. 124:9–14. VS Stores has tested swimwear three or four times over eight or nine years, selling both branded and unbranded swimwear. Nichols, 10/31/95, p. 141:20 to p. 142:14; Nichols

Depo, exhibit P–205, 09/07/95, p. 36:7 to p. 37:4. Grace Nichols has been the President of VS Stores since 1991. Nichols, 10/31/95, p. 112:10–13.

6. Victoria's Secret Catalogue ("VS Catalogue"), is a mail order business that—although smaller in size—sells a broader range of products than VS Stores, including intimate apparel, sportswear, dresses, accessories, shoes and swimwear. Nichols, 10/31/95, p. 120:19–20; Felder, 10/26/95, p. 90:5–6. VS Catalogue is a Delaware corporation with headquarters in New York City and its distribution center in Columbus, Ohio. Approximately 30 different issues of the VICTORIA'S SECRET catalogue are mailed on an annual basis. VS Catalogue circulates over 300 million catalogues annually. Berkman, 11/01/95, p. 224:21 to p. 225:3; Fisher Depo, Exhibit P–202, 08/09/95, p. 53:8–17. VS Catalogue derives approximately thirty-five percent (35 percent) of its sales from lingerie and intimate apparel. The balance comes from other apparel including dresses, coats, suits, swimwear and sportswear. Fedus, 11/1/95, 160:22–24, 163:3–4. Cynthia Fedus has been the President and Chief Executive Officer of VS Catalogue since 1988. Fedus, 11/01/95, p. 153:9–14.

7. VS Stores and VS Catalogue are both wholly-owned subsidiaries of Intimate Brands, Inc. The Limited, Inc., which was formerly the parent corporation of VS Stores and VS Catalogue, now owns 85 percent of Intimate Brands, Inc. Nichols, 10/31/95, p. 115:19–21, p. 116:5–10; Fedus, 11/01/95, p. 156:24–25. The Limited maintains offices in London, Paris and Milan as well as Hong Kong, Taiwan and Korea. Nichols, 10/31/95, p. 123:2–3; Fedus, 11/01/95, p. 157:6–11. These offices arrange for transportation when executives and employees of its subsidiary companies travel. They also give their impressions of developing fashion trends to those same companies. Fedus, 11/01/95, p. 157:11 to p. 158:2. The London office frequently guides Victoria's Secret's executives on shopping trips there. Felder, 10/26/95, p. 36:10–12.

8. Defendants monitor the domestic and international women's fashion scene. Fedus

Depo, Exhibit P–201, 8/9/95, p. 39:24 to p. 40:15. Defendants' efforts to monitor the women's fashion market include: (1) visits by VS Catalogue's fashion and design teams to fabric fairs and designer runway shows; Fedus Depo, Exhibit P–201, 08/09/95, p. 38:11 to p. 39:5; (2) subscriptions to several outside firms which report on fashion trends; Nichols Depo, Exhibit P–205, 9/7/95, p. 17:24 to p. 18:2; 10/30/95, p. 131:16–20; (3) visits to Europe, including London retailers, three or four times per year; Weiss Depo, Exhibit P–200, 08/07/95, p. 105:5–7; Nichols Depo, Exhibit P–205, 09/07/95, p. 20:2–10; Felder, 10/26/95, p. 76:20 to p. 77:13, p. 92:25 to p. 93:4; Nichols, 10/31/95, p. 143:6–23; Exhibit P–146; and (4) paid participation in the buying office in London owned and operated by The Limited, Inc. Nichols, 10/31/95, p. 123:1–13, p. 144:12 to 24.

9. VS Stores and VS Catalogue have separate officers, financial and distribution departments, different operating budgets and separate buying, marketing, and sales organizations; they nonetheless do actively cultivate a common image and share the Victoria's Secret brand. Nichols, 10/31/95, p. 119:14–120:2. Fedus, 11/01/95, p. 156:22 to p. 157:5; Felder, 10/26/95, p. 93:13 to p. 95:1; Exhibit P–146. There is no set official method for communicating between VS Stores and VS Catalogue, or between the two companies' CEO's. Felder, 10/26/95, p. 30:16–17. VS Stores may act with regard to a product without VS Catalogue's knowledge or vice versa. Felder, 10/26/95, p. 27:6–13. Both organizations tend to operate quickly and informally. Formal agenda and memoranda of meetings have generally not been created at VS Stores. Nichols, 10/31/95, p. 123:14–20; Felder, 10/26/95, p. 30:20–24; Exhibit P–201, p. 33:16 to p. 34:17.

10. Although they are separate, VS Catalogue and VS Stores engage in joint purchasing and joint marketing in some key product programs. These efforts tend to reinforce one another. Fedus depo, Exhibit P–201, 08/09/95, p. 16:20–25, p. 29:25 to p. 30:7. Fedus, 11/01/95, p. 161:17–21, p. 162:15–25, p. 164:5–21; Exhibit P–146, p. 39. VS Stores and VS Catalogue frequently purchase items from the same supplier. Fedus, 11/01/95, p.

161:15–21. VS Stores influences the marketing, names and positioning of VS Catalogue's intimate apparel products. VS Stores and VS Catalogue informally share information on successful and unsuccessful products. Fedus Depo, Exhibit P–201, 08/09/95, p. 133:2 to p. 134:6; Deckop, 10/31/95, p. 216:18–22. The two companies cooperate in regular meetings which occur approximately every three months, informally on the telephone and in casual meetings in New York. Nichols, 10/31/95, p. 149:1–19. Similar discussions concerning VS Stores' and VS Catalogue's successful and unsuccessful items, including THE MIRACLE BRA swimwear, frequently occur at the buyers' level. Felder, 10/26/95, p. 27:24 to p. 30:6; 11/01/95, p. 75:15 to p. 77:4; Fedus Depo, Exhibit P–201, 08/09/95, p. 32:11–17. VS Stores and VS Catalogue frequently include in their own product line items that have sold well in the other. VS Catalogue began selling THE MIRACLE BRA based on VS Stores' success with the item. Fedus, 11/01/95, p. 161:23–25.

11. Upon request, VS Catalogue occasionally suggests models to Stores which also infrequently borrows photographs taken by VS Catalogue. Felder, 11/01/95, p. 75:15 to p. 77:4. Ms. Nichols and Ms. Fedus share information concerning each companies' top-selling items. As a result, it is common for VS Stores and VS Catalogue to test each other's top items to decide whether to coordinate "merchandise selection." Nichols Depo, Exhibit P–205, 09/07/95, p. 117:4–22. As part of a joint marketing effort, VS Stores sells the catalogue put out by VS Catalogue at all VS Stores for $3, and gives it away for free to those customers who sign a guest book. Deckop, 10/31/95, p. 216:3–17; Felder, 10/26/95, p. 33:11 to p. 34:9; Nichols, 10/31/95, p. 143:24 to p. 144:11.

12. VS Stores and VS Catalogue have also jointly mailed postcards advertising THE MIRACLE BRA products. These were mailed to customers culled jointly from VS Catalogue's and VS Stores' customer mailing lists. Felder, 11/01/95, p. 18:23 to p. 19:12; Exhibit D–19. Customers of VS Stores occasionally inquire about a product they have seen in the catalogue published by VS Catalogue. Felder, 11/01/95, p. 77:18 to

p. 78:11. THE MIRACLE BRA (bra) was first offered by VS Catalogue in February, 1994. Fedus, 11/01/95, p. 163:8–11; Fisher, 11/02/95, p. 32:5–7. It has been featured in nearly every subsequent catalogue published by VS Catalogue. Fedus, 11/01/95, p. 163:12–15. VS Catalogue considers it a very successful item. Fedus, 11/01/95, p. 163:15–16.

13. The largest bra manufacturers in the United States include Playtex, Bali, Warner's, Vanity Fair and VS Stores. Nichols, 10/31/95, p. 139:4–6. From the late 1970's to early 1980's, A & H manufactured a running bra under the name RUNDERWEAR. Since 1992, A & H has been developing a removable swimwear bra called TOP FIT. 10/27/95, p. 98:20 to p. 105:7; Exhibits P–53, P–54. Plaintiffs have not had a significant market share of the women's lingerie industry nor do they have imminent plans to market lingerie or intimate apparel. B. Waldman, 10/25/95, p. 139–40, p. 151–52.

14. As manufactured and marketed to date, Plaintiffs' MIRACLESUIT belongs to a category of women's swimsuits which offers body control and which claims to make the wearer look slimmer. B. Waldman, 10/26/95, p. 153:21 to p. 156:7, 159:12–25. MIRACLESUIT claims to control the body by taking inches off the stomach and hips. Nichols, 10/31/95, p. 139:18–22; Felder, 11/01/95, p. 62:22–24. A majority of MIRACLESUITs contain bras with underwires; some also have padded bras. B. Waldman, 10/23/95, p. 105:15 to p. 107:14; Exhibits P–5 to P–8. Plaintiffs' MIRACLESUIT normally retails in the range of $54.00 to more than $100.00. Exhibit D–212, No. 19. MIRACLESUIT is occasionally also available at discount stores for as little as $29.99. Exhibit D–283, No. 5. This is an end-of-the-season practice to clear inventory. Neither VS Stores nor VS Catalogue sells its products to outside discounters although items are discounted within both companies. The majority of total MIRACLESUIT unit sales are one-piece suits; a minority are two-piece suits or bikinis. Non-swimsuit items represent less than 5 percent of MIRACLESUIT products. B. Waldman, 10/26/95, p. 151:25 to p. 153:18; Exhibits P–

3G, P–201, p. 17:22–24, p. 20:22 to p. 21:4, D–15 to D–16, D–104, D–272.

15. THE MIRACLE BRA is a "cleavage-enhancing product," designed to accentuate a woman's bust. The essential features of THE MIRACLE BRA are removable pads, lace, straps, padding, and underwire. Felder, 11/01/95, p. 57:7–23. THE MIRACLE BRA frequently retails for under $20. Exhibit D–2, D–3, D–5. THE MIRACLE BRA bikini is offered with the top and bottom sold separately for fitting purposes. It has the same features as THE MIRACLE BRA (bra), namely, angled underwires, push-up pads and adjustable pads. Exhibit P–200, p. 53:17–23. Both VS Stores and VS Catalogue retail THE MIRACLE BRA Bikini at a cost of $39.00 for the top and $29.00 for the bottom; THE MIRACLE BRA Maillot (one-piece) retails for $69.00. Exhibit P–200, p. 73:8 to p. 74:11; Exhibit D–283H.

## B. PRODUCT DEVELOPMENT

16. A & H procured its first patent in its MIRACLESUIT swimsuit. B. Waldman, 10/23/95, p. 71:5–14, p. 79:8–10, p. 82:2–22; Exhibit P–2. Because the suit's fabric, MIRATEX, has higher Lycra content than other control fabrics, it is costlier than the average swimsuit material. B. Waldman, 10/23/95, p. 75:2–15, p. 82:2–22. When it was introduced, the MIRACLESUIT swimsuit's construction (emphasizing horizontal control and vertical stretch) were somewhat unique to the swimwear industry. Sacco, 10/24/95, p. 62:13 to p. 62:25. There is no singly generally accepted method of body control; it can include products made with lycra, spandex, elastic, lastex and other fabrics that "hold in" some portion of the wearer. B. Waldman, 10/26/95, p. 156:11 to p. 162:12.

17. New product ideas and concepts are developed and influenced in various ways at VS Stores, including shopping trips in Europe, meetings with designers and vendors, as well as in-house design. Nichols, 10/31/95, p. 122:9–17. Following the introduction of a particular product or style, VS Stores' marketing department develops plans to optimize sales. Nichols, 10/31/95, p. 122:20–25. VS Stores began the development of a cleavage-enhancing bra in the Summer of 1992, after

personnel traveling in Europe spotted an emerging trend in fashion toward cleavage and form-fitting garments. VS Stores believed the trend would reach the United States. Felder, 11/01/95, p. 12:5–7 and 15–23; Nichols, 10/31/95, p. 126:7–20. At the time, designers were also frequently showing lingerie-influenced garments in their lines. VS Stores sought to market a cleavage-enhancing product of their own quickly. (10/31/95, p. 126:24–127:1; Nichols) Prior to THE MIRACLE BRA, VS Stores did not have such a product in its assortment. Nichols, 10/31/95, p. 126:9–12.

18. Defendants testified that there are no memoranda, other internal communications and correspondence concerning the creation and development of THE MIRACLE BRA trademark and product lines because virtually all relevant decisions were oral. Exhibit P–129, 09/08/95, Nos. 2, 3. In response to A & H's document requests, Defendants have produced only a few documents relating to the creation and product development of THE MIRACLE BRA lingerie and swimsuits. B. Waldman, 10/25/95, p. 130:3 to p. 131:2. A discussion between the two Defendant companies' presidents about pricing THE MIRACLE BRA was put into a memorandum, but never produced. Fedus Depo, Exhibit P–201, 08/09/95, p. 33:16 to p. 34:14. Additionally, numerous possible trademarks in contention at the time that THE MIRACLE BRA was chosen constituted an agenda item for a VS Stores merchandising meeting. Executives of VS Stores testified that documents containing this agenda item were committed to writing and could be made available. Nichols Depo, Exhibit P–205, 09/07/95, p. 25:9–12; Felder, 11/01/95, p. 111:2–17. The Vice President for Marketing at VS Catalogue stated that she has written no memoranda regarding THE MIRACLE BRA, nor is she aware of anyone else in VS Catalogue having written such memoranda. Weiss Depo, Exhibit P–200, 08/07/95, p. 11:18 to p. 12:5. The Executive Vice President of Marketing at VS Catalogue was also unaware of any VS Catalogue memos regarding either THE MIRACLE BRA, MIRACLESUIT or the present lawsuit. Berkman Depo, Exhibit P–203, 09/13/95, p. 66:12–21.

19. VS Stores conducted no market testing or research prior to the development or introduction of THE MIRACLE BRA. Felder, 11/01/95, p. 12:24 to p. 13:2. As yet unnamed, THE MIRACLE BRA first went into every VICTORIA'S SECRET store in August, 1993. Felder, 10/26/95, p. 22:16–20; 11/01/95, p. 14:1–2. At first, there was no promotion when the bra went into the stores. Felder, 10/26/95, p. 22:23–25; 11/01/95, p. 14:3–8; Deckop, 10/31/95, p. 205:9–12. Nevertheless, the bras started selling immediately upon introduction. Felder, 11/01/95, p. 14:14–17, p. 103:14–20. VS Stores first identified the bra as THE MIRACLE BRA for the Christmas, 1993 campaign, which began in VS Stores during November, 1993. Felder, 11/01/95, p. 15:1–3. In-store signs for THE MIRACLE BRA were first produced in November, 1993. Felder, 10/26/95, p. 22:23–25; Deckop, 10/31/95, p. 205:4–9. VS Stores devoted store windows to the promotion of THE MIRACLE BRA in March, 1994. Felder, 11/01/95, p. 15:12–18. THE MIRACLE BRA is identified with a hangtag bearing the names THE MIRACLE BRA and VICTORIA'S SECRET and showing the garment's size. Felder, 11/01/95, p. 19:17–21. The VICTORIA'S SECRET name is sewn on a label inside THE MIRACLE BRA bikini and bra. Exhibits D–39, D–285, P–107.

20. VS Catalogue followed VS Stores' lead with THE MIRACLE BRA (bra) and benefitted from VS Stores' testing of the product. As discussed below (Finding of Fact 34), VS Stores in turn later followed VS Catalogue's lead with THE MIRACLE BRA bikini. Weiss Depo, Exhibit P–200, 08/07/95, p. 181:11–21. As a result of the success of THE MIRACLE BRA products, VS Stores and VS Catalogue shared stock back and forth to maximize the inventory and to meet demand. Fedus, 11/01/95, p. 166:5–11.

## C. TRADEMARK DEVELOPMENT

21. On July 8, 1991 A & H applied for a federal trademark registration of MIRACLESUIT for use with its body control swimwear. A & H's MIRACLESUIT registration was issued on October 27, 1992. This was before VS Stores' or VS Catalogue's first use of THE MIRACLE BRA and before the

filing date of Defendants' applications for registration of any marks using the word "miracle," including VS Stores' Registration 1,849,383 for THE MIRACLE BRA for bras. Felder, 10/26/95, p. 100:2 to p. 102:5; Exhibits P–1; P–100A; P–100B; and P–149. A & H's first interstate use of its MIRACLESUIT trademark occurred in connection with a Dallas beauty pageant on November 18, 1991. B. Waldman, 10/23/95, p. 85:19 to p. 86:7; Exhibit P–26. A & H's first interstate sale of a MIRACLESUIT swimsuit occurred on November 27, 1991. B. Waldman, 10/23/95, p. 86:1–11.

22. A & H chose the MIRACLESUIT name for its body control swimsuit based on their belief that the name was "unique, dynamic, exciting and memorable." B. Waldman, 10/23/95, p. 71:15–25; Exhibit P–1. At the time A & H adopted MIRACLESUIT, it was unaware of any use by anyone of MIRACLE or MIRACLESUIT in connection with either swimsuits or lingerie. B. Waldman, 10/23/95, p. 72:4–10; p. 83:10–21; 10/26/95, p. 213:2 to p. 214:10. Prior to adopting MIRACLESUIT, A & H conducted a trademark search of MIRACLE for both swimsuits and for lingerie. B. Waldman, 10/23/95, p. 72:4–10, p. 83:7–18; 10/26/95, p. 210:25 to p. 211:18; 10/27/95, p. 33:4–20. Although the results of the trademark search conducted by A & H disclosed a "Miracle" trademark registered in 1918 for corsets, brassieres and ladies' underwaists, A & H's was not able to locate any current use of the mark. B. Waldman, 10/26/95, p. 214:17 to p. 216:10, Exhibit D–253. This 1918 registration was revealed in the 1991 trademark search but did not show up in a subsequent search of MIRACLE for swimsuits and related products in 1995. B. Waldman, 10/27/95, p. 67:25 to p. 69:14, p. 71:2–6; Exhibit D–253.

23. The responsibility for developing new Victoria's Secret product names lies with the marketing department at VS Stores. VS Stores' merchandising group typically presents a product idea to its marketing department which then develops a list of names for review. Nichols, 10/31/95, p. 127:14–18. VS Stores is generally responsible for those trademarks shared with VS Catalogue. Fedus, 11/01/95, p. 163:21 to p. 164:2. Ms. Joanna Felder in the Marketing Department at VS Stores generated potential names for what ultimately became THE MIRACLE BRA. Felder, 10/26/95, p. 66:21–23. She testified that in considering names, they wanted a "fresh, flirtatious, fun attitude" for their push-up bra. Felder, 10/26/95, p. 81:21–23. During a merchandise meeting in October, 1992, one of VS Stores' fit models exclaimed, "Wow, this is a miracle!" after trying on the new cleavage-enhancing bra. Felder, 10/26/95, p. 44:10–21; 11/01/95, p. 13:16–24. VS Stores thereafter started actively considering the name THE MIRACLE BRA. Felder, 11/01/95, p. 13:7–9; Nichols, 10/31/95, p. 126:18. In early December, 1992, VS Stores decided to apply for trademark registration of THE MIRACLE BRA for bras. Felder, 11/01/95, p. 58:11–16. The ultimate authority for approving VS Store's product names resides in Grace Nichols, its President. Exhibit P–129, Int. No. 3(d). No one from VS Catalogue was involved in the selection of THE MIRACLE BRA name. Nichols, 10/31/95, p. 136:2–4; Fedus, 11/01/95, p. 163:17–19; Felder, 11/01/95, p. 59:23–60:1. There are no people from VS Catalogue's marketing department in the marketing department of VS Stores. Nichols, 10/31/95, p. 156:10–20. No one at VS Catalogue was involved in decisions regarding in-store signs of THE MIRACLE BRA for VS Stores. Felder, 11/01/95, p. 60:2–5.

24. When VS Stores decided to use THE MIRACLE BRA mark, its Director of Brand Imaging, Ms. Felder, contacted Defendants' trademark counsel. Felder, 10/26/95, p. 42:15–20; 11/01/95, p. 57:24 to p. 58:6. On November 19, 1992, counsel performed a trademark search in International Classes 25 (clothing) and 24 (textiles) prior to filing its application for THE MIRACLE BRA (bra). The search revealed numerous MIRACLE trademarks, including A & H's MIRACLESUIT trademark registration. Exhibit P–137, 09/08/95, No. 2; Felder, 10/26/95, p. 45:10 to p. 47:21; 11/01/95, p. 69:12 to p. 70:5; Exhibits P–114A, P–125. Mr. Deckop, Stores' Chief Financial Officer, signed VS Stores's application for registration of THE MIRACLE BRA (bra), but did not know about the November 19, 1992 search report which resulted from Ms. Felder's request to

Defendants' counsel. Ms. Felder's name appears on the search results. Felder, 11/01/95, p. 58:7–19, p. 65:19 to p. 66:20; Deckop Depo, Exhibit P–204, 08/10/95, p. 26:16 to p. 27:22, p. 32:16–20; Exhibit 114A.

25. With regard to executing VS Stores' application for registration for THE MIRACLE BRA for swimsuits and another one for perfumes, Mr. Deckop stated that he would sign whatever the company attorneys gave him. Deckop, 10/31/95, p. 195:24 to p. 196:22, p. 217:21 to p. 218:10. Mr. Deckop had the ultimate authority to authorize trademark searches and had executed all VS Stores' trademark applications for the prior ten years. Deckop, 10/31/95, p. 163:9–24, p. 166:22–25, p. 179:2–14; Exhibit D–81B. When VS Stores filed its application for THE MIRACLE BRA (bra) on December 9, 1992 (which registered on August 9, 1994), Mr. Deckop was clearly aware that that registration covered only bras, and not swimwear. Deckop Depo, 08/10/95, p. 38:10–23; Exhibits P–100A, P–204. Mr. Deckop however was not responsible for the later decision to withdraw applications to register various MIRACLE trademarks filed by VS Stores. That decision was made by either Ms. Felder or Ms. Carol Mabe. Deckop, 10/31/95, p. 201:6 to p. 202:2, p. 203:3 to p. 204:2; Exhibit P–100C to P–100L. Neither was VS Catalogue's CEO involved in requesting trademark searches, for either THE MIRACLE BRA for bras or swimwear; she nonetheless assumed that one had been done. Fedus Depo, Exhibit P–201, 08/09/95, p. 73:7–17; 10/30/95, p. 130:13–16.

26. No one at VS Stores who played a role in selecting or approving THE MIRACLE BRA name had heard of MIRACLESUIT or A & H before the commencement of this action. Felder, 10/26/95, p. 48:15–17, p. 49:2–5; 11/01/95, p. 61:6–23, p. 62:5–7; Deckop, 10/31/95, p. 173:21–24, p. 180:12–16; Fedus, 11/01/95, p. 185:5–18. Ms. Felder, who initially chose the name THE MIRACLE BRA for VS Stores, was not aware that VS Catalogue sold the MIRACLESUIT prior to the lawsuit (Finding of Fact 28). Felder, 10/26/95, p. 52:4–6. Ms. Felder was also not aware that MIRACLESUIT appeared in fashion page articles, on the back page of the swimwear supplement to *Women's Wear Daily*, or as an advertisement in *Glamour* magazine. Felder, 10/26/95, p. 53:17–22, p. 54:15–19.

27. VS Catalogue and VS Stores both participate in the London office of The Limited Inc., which monitors the fashion scene in London and elsewhere to learn of fashion trends and styles for possible addition to their product lines. Nichols Depo, Exhibit P–205, 09/07/95, p. 17:12–21, p. 20:2–10, p. 119:22 to p. 120:11; Nichols, 10/31/95, p. 123:1–13, p. 143:6–23, p. 144:12–24; Weiss Depo, Exhibit P–200, 08/07/95, p. 105:5–10, p. 156:17 to p. 157:9; Felder, 10/26/95, p. 92:25 to p. 93:4; 11/01/95, p. 12:13–23; Fedus, 11/01/95, p. 157:6 to p. 158:2; Exhibit P–146. Two representatives from The Limited attended the Sun and Swimwear trade show in July 1992 in London. Felder, 10/26/95, p. 79:1 to p. 81:3; 11/01/95, p. 92:18 to p. 93:8, p. 95:8–20; Exhibits P–16, P–33D, P–42. During that show, A & H's MIRACLESUIT swimsuits were featured on the front cover of *Contours* magazine, a U.K. swimwear trade publication. The magazine was distributed to all attendees. B. Waldman, 10/24/95, p. 138:12 to 139:24, p. 120:8–23; Felder, 11/1/95, p. 93:10 to p. 95:6; Exhibit P–33D.

28. Prior to Defendants' adoption and use of THE MIRACLE BRA mark for either bras or swimsuits, VS Catalogue had purchased A & H's swimsuits for sale in the Catalogue. VS Catalogue's Director of Merchandising for Swimwear was first shown MIRACLESUIT control swimsuits in July, 1992, by Mr. Mark Waldman at a Miami swimwear show. Mr. Mark Waldman thereafter sent her samples of MIRACLESUIT swimsuits in New York City. Weiss Depo, Exhibit P–200, 08/07/95, p. 109:16 to p. 111:12; Weiss, 11/02/95, p. 7:7–23, p. 8:1–23; M. Waldman, 10/27/95, p. 106:6 to p. 108:12; Exhibit P–116. Ms. Weiss was given complete advertising information regarding MIRACLESUIT swimsuits and she knew that Mainstream and A & H referred to them as MIRACLESUIT. M. Waldman, 10/27/95, p. 110:12–16, p. 166:6–17. Around July, 1992, in a meeting attended by Ms. Fedus, VS Catalogue committed to running A & H's MIRACLESUIT swimsuit. On September 1, 1992,

VS Catalogue placed its first order. Weiss Depo, Exhibit P–200, 08/07/95, p. 48:18 to p. 49:9, p. 50:4–6.

29. Ms. Weiss requested that VS Catalogue's copyrighting staff use the MIRACLESUIT trademark in the VS Catalogue. However, when the MIRACLESUIT swimsuit subsequently appeared in VS Catalogue's catalogue in February, 1993, the trademark MIRACLESUIT was not included. M. Waldman, 10/27/95, p. 114:1–14; B. Waldman, 10/24/95, p. 41:18 to p. 42:12; Exhibit P–117A to P–117C. Mr. Mark Waldman called Ms. Weiss and informed her of the omission and requested that the mark be included in the next catalogue. Ms. Weiss apologized, attributing the decision to omit the mark to the VS Catalogue creative team. She stated she would get the MIRACLESUIT mark included in the next issue of the catalogue for an additional 2 percent (over the standard 4 percent) advertising fee. M. Waldman, 10/27/95, p. 114:17 to p. 116:23; Weiss, 11/02/95, p. 10:24 to p. 11:21; Weiss Depo, Exhibit P–200, p. 123:25 to p. 124:18, p. 125:25 to p. 126:12; 10/27/95, p. 184:24 to p. 186:5. Mr. Mark Waldman had believed that the four percent discount Defendants received was in consideration for the appearance of the MIRACLESUIT trademark in VS Catalogue's catalogue. M. Waldman, 10/27/95, p. 108:16 to p. 110:5, p. 111:3–16; Exhibit P–116. VS Catalogue's Spring Preview '93 catalogue again omitted the MIRACLESUIT trademark. The head of that catalogue's creative team was unable to explain the reason for this omission. Berkman, 11/01/95, p. 238:19 to p. 239:6; Weiss Depo, Exhibit P–200, 08/07/95, p. 48:18 to p. 50:6, p. 116:17 to p. 117:8, p. 118:23 to p. 119:24, p. 120:2 to p. 121:18, p. 122:11 to p. 123:25, p. 125:25 and p. 126:12 and 22; 10/27/95, p. 181:18 to p. 186:19; Fedus, 11/01/95, p. 197:10 to p. 199:16.

30. When the February, 1993, issue of the catalogue offering the MIRACLESUIT swimsuit appeared, the MIRACLESUIT mark was again omitted. The swimsuit was instead identified by the name SWIM SHAPER. Another version of this same catalogue, with the same omission, was distributed under a different cover. This catalogue also omitted the MIRACLESUIT trademark and substituted the description "Body Slimmer." Exhibits P–117B, P–117C. Mark Waldman again spoke with Ms. Weiss, who stated she could not offer a reason for the name change. M. Waldman, 10/27/95, p. 116:4 to p. 119:19. Mr. Mark Waldman had not requested Ms. Weiss to use the SWIM SHAPER name in the catalogue in connection with the MIRACLESUIT swimsuit; he told Ms. Weiss that MIRACLESUIT should have been used instead. M. Waldman, 10/27/95, p. 116:20 to p. 119:17; Exhibit P–117C. VS Catalogue was billed by Mainstream on numerous invoices which bore the heading MIRACLESUIT by SWIMSHAPER. Payments by VS Catalogue were made to "Swimshaper." M. Waldman, 10/27/95, p. 112:4 to p. 113:1; Exhibit P–116. In all, A & H sold a total of 1,700 swimsuits to VS Catalogue. Because it had not printed the name MIRACLESUIT as promised, VS Catalogue returned to A & H two of the six percent promotional discount which A & H had given VS Catalogue. M. Waldman, 10/27/95, p. 118:12 to p. 119:19, p. 156:7–19; Weiss Depo, Exhibit P–200, p. 125:25 to p. 126:11; 10/27/95, p. 185:19 to p. 186:19; Weiss, 11/02/95, p. 11:22 to p. 12:7; Exhibit P–116. VS Catalogue has made no further purchases of A & H swimsuits since the MIRACLESUIT swimsuits were purchased in 1992. Weiss, 11/2/95, p. 12:15–17.

31. On December 9, 1992, VS Stores filed an application based on "intent-to-use" for the trademark THE MIRACLE BRA with the United States Patent and Trademark Office ("PTO"). Exhibit D–81B. The application was registered on August 9, 1994, as THE MIRACLE BRA for bras in Class 25, based on a first-use date of January, 1994. Exhibits P–100A, D–81A. Prior to this lawsuit, Plaintiffs did not oppose VS Stores' application to register THE MIRACLE BRA trademark for bras. Neither did Plaintiffs send either VS Stores or VS Catalogue a cease and desist letter, or otherwise register their objection to VS Stores' or VS Catalogue's use of THE MIRACLE BRA trademark. B. Waldman, 10/25/95, p. 127–29; 10/27/95, p. 14–16; M. Waldman, 10/27/95, p. 159–161; Felder, 11/01/95, p. 15:1–3; Exhibit P–81. Neither VS Stores nor VS Catalogue

therefore was aware of any objection by Plaintiffs, until A & H commenced this civil action in December, 1994 after THE MIRACLE BRA had been extensively advertised and sold for approximately one year. Nichols, 10/31/95, p. 157:3-5, 14-25; Fedus, 11/01/95, p. 183:4-9.

## D. MIRACLE BRA SWIMWEAR DEVELOPMENT

32. Swimwear has been offered for sale by VS Stores on a limited test basis three or four times over the previous eight or nine years. Deckop, 10/31/95, p. 219:10-21; Nichols, 10/31/95, p. 141:23-24. Prior to THE MIRACLE BRA bikini, VS Catalogue had begun to build its swimwear business. Berkman, 11/01/95, p. 231:6-11; Weiss, 11/02/95, p. 7:3-6. In March, 1994, VS Catalogue launched a specialty catalogue that primarily featured swimwear. The catalogue was considered very successful by VS Catalogue. Fedus, 11/01/95, p. 171:21 to p. 172:3. Berkman, 11/01/95, p. 231:15-16. VS Catalogue mailed two editions of the swimwear issue in 1994, and two more in 1995. Fedus, 11/01/95, p. 172:7-8.

33. Swimwear is a much larger proportion of VS Catalogue's business than it is for VS Stores. Fedus, 11/01/95, p. 175:17-23. The idea to put THE MIRACLE BRA tradename and feature (enhanced cleavage) into a bikini came from VS Catalogue as a direct result of THE MIRACLE BRA's success. Fedus, 11/01/95, p. 163:8-9, p. 175:5-7. THE MIRACLE BRA Bikini first entered VS Catalogue's assortment in the Resort '95 Catalogue edition which mailed in November, 1994. Fedus, 11/01/95, p. 174:9-11; Weiss, 11/02/95, p. 14:6-9; Exhibit D-100. VS Catalogue has offered THE MIRACLE BRA swimwear with different shape bikini bottoms, different print patterns, and a one-piece construction. Fedus, 11/01/95, p. 179:19-21. Each has the padded, push-up feature of THE MIRACLE BRA. VS Catalogue currently has no plans to discontinue the swimwear business or the use of THE MIRACLE BRA on swimwear, including THE MIRACLE BRA Bikini. Fedus, 11/01/95, p. 170:8-14, p. 172:17-22, p. 175:25 to p. 176:1.

34. With the exception of the availability of the VS Catalogue for purchase in Stores, VS Stores did not actively market swimwear. Mabe, 10/31/95, p. 247:20-23. On August 30, 1994, VS Stores applied for a trademark registration for THE MIRACLE BRA for "swimsuits, bathing suits and bikinis," application Serial No. 74/567,540. Exhibit P-137, 09/08/95, No. 14; Exhibit P-100B. VS Catalogue's and VS Stores' first use of THE MIRACLE BRA with regard to swimwear occurred without marketing as a test in ten stores in November, 1994. Exhibit P-127, 07/14/95, No. 9; Nichols, 10/31/95, p. 137:9-16; Fedus, 11/1/95, p. 175:4-14. Felder, 11/01/95, p. 28:8-11; The decision to expand the test was made sometime in or just before January, 1995. Nichols, 10/31/95, p. 138:4-7; Felder, 11/01/95, p. 96:25 to p. 97:19. The test was later extended to 160 stores during the Spring of 1995. Felder, 11/01/95, p. 28:15-16; Nichols, 10/31/95, p. 137:17-25; Deckop, 10/31/95, p. 220:4-8. Last year, VS Stores printed a hang tag and one small sign for an in-store test of THE MIRACLE BRA Bikini. Mabe, 10/31/95, p. 247:19-22, p. 248:10-12; Felder, 11/01/95, p. 28:17 to p. 29:9; Exhibits D-15 to D-18.

35. Neither VS Stores' nor VS Catalogue's Presidents knew if the other had performed an availability search of THE MIRACLE BRA with regard to swimwear. Felder, 10/26/95, p. 85:4 to p. 86:18; Nichols Depo, Exhibit P-205, p. 42:3-10; 10/30/95, p. 131:21-23; Fedus, 11/01/95, p. 188:24 to p. 189:4; Weiss, 11/02/95, p. 24:17-21. Defendants apparently performed a search of MIRACLE with regard to perfumes and related goods on February 3, 1995, but not for swimwear. B. Waldman, 10/25/95, p. 130:3 to p. 131:10, Exhibit P-114C. In executing VS Stores' application for registration of THE MIRACLE BRA for swimsuits, Mr. Deckop had assumed VS Stores' had performed a trademark search. He testified that he relied on counsel to present papers that merely required his review and signature. Deckop Depo, Exhibit P-204, 08/10/95, p. 77:18-22; Deckop, 10/31/95, p. 179:15-19.

36. On February 27, 1995, the Patent and Trademark Office's examining attorney, in what is called an "office action," refused VS

Stores' application for registration of THE MIRACLE BRA bikini, on the basis of A & H's prior registration of MIRACLESUIT swimwear. Exhibit P–137, 09/08/95, No. 18; Exhibits P–100B, P–115. Defendants' trademark counsel informed VS Stores of the refusal in a letter to Mr. Deckop dated March 10, 1995. Deckop, 10/31/95, p. 195:3–11; Exhibits P–115, P–140. Mr. Deckop nevertheless testified that he had never seen the Refusal letter from the Patent and Trademark Office transmitted to him by his Defendants' trademark counsel. Deckop, 10/31/95, p. 186:18 to p. 188:20; Exhibit P–115. In a letter received March 13, 1995, Defendants' trademark counsel requested the Examining Attorney to suspend prosecution of the application pending the outcome of this civil action. Exhibits D–81C, P–100B.

37. On March 22, 1995, Joanna Felder received a letter from Victoria's Secret's trademark counsel advising her of the Patent and Trademark Office's refusal in light of A & H's registered MIRACLESUIT trademark. Felder, 10/26/95, p. 55:2 to p. 56:3; P–142. Despite the refusal, VS Stores' President stated that that action has had no effect on her decisions concerning the marketing or sale of any of THE MIRACLE BRA products. Nichols, 10/31/95, p. 153:25 to p. 154:8. The Refusal by the Patent and Trademark Office of THE MIRACLE BRA application for registration for swimsuits did not state that the registration had been suspended. Deckop, 10/31/95, p. 198:13 to p. 199:17. Defendants have asserted that VS Stores' THE MIRACLE BRA trademark application for swimwear nevertheless was suspended as of the refusal. The first notice of any Patent and Trademark Office suspension with respect to that application was August 31, 1995. Exhibits P–127, 07/14/95, Nos. 5, 51; P–137, 09/08/95, Nos. 36, 37; D–81; Deckop, 10/31/95, p. 196:24 to p. 198:11. This is due to Defendants' response to the office action, sent to the PTO on March 10, 1995, which requests suspension of the application in view of the pending litigation. Exhibit P–100B.

## E. LINGERIE AND SWIMWEAR MARKETS

38. Mainstream typically sells its MIRACLESUIT to trade buyers for department stores, specialty stores and catalogue houses. Oginz, 10/26/95, p. 113:15–22; Exhibit p–62A. Nordstrom's department store is a major MIRACLESUIT swimsuit customer. Sacco, 10/24/95, p. 50:23 to p. 51:9; Exhibit P–9B(2). Plaintiffs also compete against branded catalogues. B. Waldman, 10/24/95, p. 34:12. National-distribution catalogues represent 25 percent of MIRACLESUIT's customer base. B. Waldman, 10/24/95, p. 30:15–17. MIRACLESUIT is purportedly targeted to women ages "19 to infinity" who can afford to buy a "premium product" that is "pretty" and "shapes and contours the figure comfortably." B. Waldman, 10/24/95, p. 38:24–p. 39:5.

39. The Victoria's Secret companies target women aged 18 to 50; VS Stores in particular targets women aged 18 to 34. Felder, 11/01/95, p. 8:14–16. The specific company image aspired to by VS Stores is of a sensuous, glamorous, luxurious, feminine boudoir with lingerie and intimate apparel. Felder, 11/01/95, p. 8:3–10; Nichols, 10/31/95, p. 116:13–14; Berkman, 11/01/95, p. 221:4–8, p. 223:21–23; Mabe, 10/31/95, p. 230:16–18. Additionally, both VS Stores and VS Catalogue seek to convey an English origin. Felder, 10/26/95, p. 37:2–4.

40. VS Stores and VS Catalogue compete with department stores, mass merchandisers, specialty retailers, boutiques and catalogue operations. VS Stores' primary competitors are department stores. To a very limited extent, the two VS companies even regard each other as competitors. Felder, 10/26/95, p. 78:1 to p. 78:4, p. 89:8 to p. 90:3; Nichols, 10/31/95, p. 118:12–15, p. 150:13–17; Nichols Depo, Exhibit 205, p. 121:25 to p. 122:4; Exhibit P–146. VS Catalogue obtains approximately 20 percent of its mailing list from the mailing lists of its competitors including Spiegel, Lew Magram, Domestications, Chadwick's, A.B. Lambdin, Clifford & Wills, J. Crew, Saks Folio, Bloomingdale's by Mail, Popular Club and Talbot's. Weiss Depo, Exhibit P–200, 08/07/95, p. 203:17 to p. 204:11; Berkman Depo, Exhibit P–203, 09/13/95, p. 74:7 to p. 75:23; B. Waldman, 10/24/95, p. 32:24 to p. 33:20; p. 36:25 to p. 38:14; Fedus, 11/01/95, p. 185:19 to p. 186:20;

Fedus Depo, Exhibit P–201, 08/09/95, p. 11:2–11; Felder, 11/01/95, p. 132:5–7; Berkman, 11/01/95, p. 238:15–18; Weiss, 11/02/95, p. 23:23 to p. 24:16; Exhibits P–61A, P–146. VS Catalogue also acts as an advertising vehicle for the stores. Fedus, 11/01/95, p. 164:10–18. The Catalogue is available from VS Stores and stimulates sales of some items that are also sold by VS Catalogue. Items manufactured and labeled under the VICTORIA'S SECRET tradename, including THE MIRACLE BRA, are only available at VS Stores and VS Catalogue. Exhibit P–127, No. 31.

41. Defendants believe that THE MIRACLE BRA is consistent with Victoria's Secret image, and that in enhancing a woman's cleavage it makes them feel more attractive. Nichols, 10/31/95, p. 128:21–24, p. 131:24 to p. 132:1; Mabe, 10/31/95, p. 241:23–25. Among the responsibilities of VS Stores' marketing department is to "brand extend" where they feel it is appropriate. Nichols, 10/31/95, p. 133:1–4. Once THE MIRACLE BRA had also proven successful for VS Catalogue, their merchandising team considered products to which they also could extend the THE MIRACLE BRA. Fedus, 11/01/95, p. 166:15–22, p. 167:12–15. Felder, 10/26/95, p. 57:13–17; Nichols, 10/31/95, p. 133:10–12. These additional products included a slip, bodysuit, and nightgown which shared THE MIRACLE BRA's cleavage-enhancement attribute. Nichols, 10/31/95, p. 133:14–134:2. On November 29, 1994, VS Stores filed ten trademark applications based on an intent-to-use marks which consisted in part of the word "Miracle." These were withdrawn in April 1995, without having been put into use. Felder, 11/01/95, p. 126:2–6; Mabe, 10/31/95, p. 233:9–21; Exhibit D–53. By Christmas of 1994—approximately four months after VS Stores' application to register THE MIRACLE BRA for swimsuits, bathing suits and bikinis—VS Catalogue had developed and marketed THE MIRACLE BRA chemise, THE MIRACLE BRA bodysuit, THE MIRACLE BRA demi-cup, THE MIRACLE BRA (bra) in satin, THE MIRACLE BRA

halter and THE MIRACLE BRA bikini. Fedus, 11/01/95, p. 166:23–167:3. The Court received into evidence examples of THE MIRACLE BRA swimwear, including bikinis (Exhibit P–106), bikinis with a "push-up" feature (Exhibit P-107), and one piece swimsuits (Exhibit P–108).

42. Defendants termed their decision to broaden the use of the name THE MIRACLE BRA into swimwear "instinctive"—a way to expose the enhanced-cleavage attribute to potential customers in as many ways as possible. Fedus, 11/01/95, p. 175:5–11. Defendants primarily target women who desire to enhance their bust and who are also willing to pay a "premium" price for a swimsuit. These two target consumer pools overlap considerably; Defendants' control study indicates they may do so more frequently in the future.[2] B. Waldman, 10/24/95, p. 38:18 to p. 39:5., p. 92:14–18, p. 131:17 to p. 132:11, p. 163:6–18; Exhibit P–331. However, there is no indication that either VS Stores or VS Catalogue currently has any concrete plans to bring such products to market, nor if they did, that such products would be marketed using THE MIRACLE BRA trademark.

43. MIRACLESUIT swimsuits and THE MIRACLE BRA products are sold through similar channels of trade. Both MIRACLESUIT swimsuits and Defendants' THE MIRACLE BRA swimsuits and lingerie are sold through catalogues. THE MIRACLE BRA swimsuits and lingerie are sold in VS Catalogue; MIRACLESUITs are sold in numerous competitors' catalogues. B. Waldman, 10/24/95, p. 7:3–24, p. 18:22 to p. 19:4, p. 21:17 to p. 27:17, p. 28:8–10; Sacco, 10/24/95, p. 50:18–22; Exhibits P–9B(1) to P–9B(12), P–9C. It would be possible for a customer to see both a MIRACLESUIT swimsuit at a department store and THE MIRACLE BRA Bikini at a VS Stores' store within the same shopping mall. Felder, 11/01/95, p. 134:3–7.

44. MIRACLESUIT and THE MIRACLE BRA swimsuits are similarly priced. Both THE MIRACLE BRA and the MIRACLESUIT swimsuits sell for over $50. In

---

**2.** According to that control study, *all women* surveyed, "young and old, slimmer and fatter, felt their bodies in need of reshaping or smoothing." Exhibit P–331, p. 19. The same study stated that "Women consistently ask for control products that are Comfortable + Functional + (of particular importance) 'Pretty.'" Exhibit P–331, p. 8.

the swimsuit industry, a price level of over fifty dollars for swimsuits is considered a single price category. The MIRACLESUIT is also occasionally discounted at the end of a season. B. Waldman, 10/24/95, p. 92:10–18; B. Waldman Depo, D–216, 7/26/95, p. 49:12–19. THE MIRACLE BRA bikini tops are priced at $39 and bikini bottoms at $29, for a total of $68. THE MIRACLE BRA one-piece suits regularly sell for $69. Weiss Depo, Exhibit P–200, 08/07/95, p. 73:13–15, p. 74:10–11; B. Waldman, 10/24/95, p. 42:16–20; Exhibits P–108, P–117A. When it ran in VS Catalogue (Findings of Fact 28 and 29), The MIRACLESUIT one-piece swimsuit sold for $69. B. Waldman, 10/24/95, p. 90:3–13; Exhibits P–9B, P–49A. MIRACLESUIT swimsuits' retail prices range from $68 to $102. A & H's prices to its retail customers are approximately one-half the final retail price to consumers. B. Waldman, 10/23/95, p. 144:4 to p. 153:6; 10/24/95, p. 8:21 to p. 11:9, p. 18:4 to p. 19:4, p. 21:17 to p. 27:17, p. 29:9–10; Exhibits P–3A to P–3G, P–9A(1) P–9A(2), P–9B(1) to P–9B(12), P–9C.

### F. PRODUCT SIMILARITIES AND DIFFERENCES

45. Lingerie and women's swimwear are related products to the extent that they both are women's clothing, they both are worn immediately next to the skin, and they share several design features. Swimsuits incorporate bras into their design. Executives of both Defendants and Plaintiffs acknowledged that bras and swimsuits are closely-related products. Weiss Depo, Exhibit P–200, 08/07/95, p. 88:10–14; Fedus, 11/01/95, p. 189:5–20; B. Waldman, 10/25/95, p. 100:24 to p. 101:2; p. 104:4–22; p. 107:16 to p. 108:7; Exhibits P–55B, P–55F, P–101, P–102. VS Catalogue's Divisional Merchandise Manager stated that the swimwear business is "very bra-driven" because several bra features are incorporated in swimwear. She also acknowledged that bras and swimsuits share silhouettes and sizing. Weiss Depo, Exhibit P–200, p. 88:10–24; 10/30/95, p. 131:11–15; Weiss, 11/02/95, p. 22:24 to p. 23:21. Nichols, 10/31/95, p. 138:8–12. Both she and VS Stores' President stated that expansion of THE MIRACLE BRA from bras to swimwear would be a "natural extension" of the mark. Weiss Depo, Exhibit P–200, 08/07/95, p. 86:3 to p. 87:4; Nichols Depo, Exhibit P–205, p. 94:20 to p. 95:4; 10/30/95, p. 131:24 to p. 132:1; Nichols, 10/31/95, p. 150:5–12.

46. MIRACLESUIT swimsuits contain a variety of different bras, including some with pads similar to those incorporated into THE MIRACLE BRA. B. Waldman, 10/23/95, p. 105:15 to p. 107:7, p. 112:1–17; 10/24/95, p. 157:1 to p. 157:23; Exhibits P–14, P–15. Swimwear and lingerie use some of the same designations. Among these are "bikini" and "thong", which can refer to either swimwear or lingerie bottoms. Nichols Depo, Exhibit P–205, 09/07/95, p. 93:15 to p. 94:6; B. Waldman, 10/24/95, p. 164:21 to p. 165:17; 10/25/95, p. 106:4–16; Felder, 10/26/95, p. 24:8–22. Exhibits P–331, P–332. Both VS Stores and VS Catalogue sell lingerie and swimwear. Nichols Depo, Exhibit P–205, 09/07/95, p. 92:7–11; Exhibit P–137, 09/08/95, Nos. 42, 47, No. 131; Berkman Depo, Exhibit P–203, 09/13/95, p. 35:21–23. MIRACLESUIT swimsuits also occasionally combine swimwear and lingerie features. B. Waldman, 10/23/95, p. 148:17–21. exhibits P–3B, P–3C, P–3D, P–3E. VS Catalogue created THE MIRACLE BRA bikini (a swimsuit) using THE MIRACLE BRA bra (a piece of lingerie) as the two-piece suit's top. Fedus Depo, Exhibit P–201, 08/09/95, p. 68:2–14; Weiss Depo, Exhibit P–200, 08/07/95, p. 53:11–23.

47. All of A & H's MIRACLESUIT swimsuits have lower torso control; a few have cleavage enhancement in the form of push-up or padded bras. Most of Defendants' THE MIRACLE BRA products have cleavage enhancement; a few have lower torso control. Weiss Depo, Exhibit P–200, 08/07/95, p. 132:19 to p. 133:7. The MIRACLESUIT swimsuit line and Defendants' THE MIRACLE BRA bikini control bottom both offer body control of varying degrees. B. Waldman, 10/24/95, p. 158:13 to p. 159:7; Fedus, 11/01/95, p. 190:3 to p. 192:9; Exhibits P–5, P–49–A, P–107, P–124. Plaintiffs occasionally offer products under the MIRACLESUIT name with features other than control. For example, the MIRACLESUIT swimsuit line included a push-up bra model for sale in the 1994–95 season, prior to this lawsuit. B.

Waldman, 10/26/95, p. 165:17 to p. 167:1; Exhibit P–3. Defendants similarly have offered products under their THE MIRACLE BRA line that are not cleavage-enhancing. Exhibit P–109 is a sports bra in THE MIRACLE BRA line that apparently offers no such feature.

48. Two of ten products using the name MIRACLE for which Defendants applied for registration with the United States Patent and Trademark Office in November, 1994, are swimsuits. The remaining eight are lingerie. Deckop, 10/31/95, p. 199:19 to p. 201:5, Exhibits P–100C to P–100L. A few of Defendants' MIRACLE lingerie items offer lower torso control, such as THE MIRACLE BRA control slip, high-cut control brief, Body Briefer, and panty. B. Waldman, 10/24/95, p. 160:3 to p. 162:25, Exhibits P–49B, P–49C, P–49D, P–103, P–105, P–111, P–124A; Felder, 11/01/95, p. 127:6 to p. 128:3. VS Catalogue's description of THE MIRACLE BRA control slip states that it "slims and shapes." VS Stores' control study reflects defendants' interest, as of August 1995, in developing products with control as their principal selling point, similar to Plaintiffs' MIRACLESUIT swimsuits. 10/25/95 p. 88:2 to p. 98:3, p. 120:11–25; B. Waldman, 10/24/95, p. 166:11–18; Exhibit P–331, p. 25. Mabe, 10/31/95, p. 236:22 to p. 238:3.

49. VS Catalogue's President acknowledged that the MIRACLESUIT swimsuit and THE MIRACLE BRA control slip both perform the same posterior-holding function. Fedus Depo, Exhibit P–201, 08/09/95, p. 118:13 to p. 120:9. It is difficult to distinguish the amount of control offered by these two products. Fedus, 11/01/95, p. 200:8 to p. 202:17, Exhibit P–49D. THE MIRACLE BRA Body Briefer, like A & H's MIRACLESUIT swimsuits, also offers a bra and a control feature. B. Waldman, 10/25/95, p. 80:7 to p. 83:12; Fedus, 11/01/95, p. 193:18 to p. 195:4, Exhibits P–35, P–49C.

50. The maker of THE MIRACLE BRA (bra) was chosen to make THE MIRACLE BRA swimsuit as well because its expertise with one was applicable to the other. Fedus Depo, Exhibit P–201, 08/09/95, p. 113:13–22. Swimwear and lingerie are advertised and promoted in the same media. National circulation magazines commonly feature and advertise both swimwear and intimate apparel. The MIRACLESUIT swimsuit and THE MIRACLE BRA line sometimes appear just pages apart. Stipulation, 10/24/95, p. 137:4–14; B. Waldman, 10/24/95, p. 107:21 to p. 108:7; 10/25/95, p. 108:8–19; Felder, 11/01/95, p. 142:25 to p. 143:2; Exhibits P–18T, P–20A, P–20B, P–20C, P–60A to P–60D. Several brands or trademarks are jointly used in lingerie and swimwear. These include Guess, Wonderbra, Bolero, Calvin Klein, Speedo and THE MIRACLE BRA. B. Waldman, 10/25/95, p. 99:22 to p. 105:2; Exhibit P–55 A–F.

## G. TRADEMARK SIMILARITIES AND DIFFERENCES

51. The Principal Register at the United States Patent and Trade Office contains hundreds of registered trademarks incorporating the word "Miracle" as part of their mark. Nevertheless, a majority of the "miracle" marks cited in Defendants' search are either abandoned, canceled or not renewed. Hynak, 11/02/95, p. 89:1 to p. 90:7; Exhibits D–119 to D–182, D–184, D–186 to D–189, D–192 to D–197, D–199, D–201 to D–204B, D–245 A–Q. When A & H applied to register the trademark MIRACLESUIT on July 8, 1991, several other so-called "miracle" marks were already registered.[3] Following the registration of MIRACLESUIT, an application for a trademark MIRACLE for "shirts, jackets, caps and hats," was initially rejected on the basis of the Examining Attorney's citation of Plaintiffs' registration. However, a registration did subsequently issue for MIRACLE when applicants qualified their claim to cover only those goods used to promote a profes-

---

**3.** These included MIRACLE for hosiery, MIRACLE CLIP for neckwear, MIRACLE KNIT for pantyhose, MIRACLE MILLER for men's suits and sport coats, MIRACLE TREAD for shoes, MIRACLETTES for shoes, MIRACLE KID for men's women's and children's leather gloves, LITTLE MIRACLES for girls' and boys' infant tops, pants, shorts and creepers, THE MIRACLE SHOE for shoes, WHISPIES BY MIRACLE TREAD for shoes. Hynak, 11/02/95, p. 64, p. 67–68. Exhibits D–122 to D–131.

sional baseball team. Hynak, 11/02/95, p. 74. Exhibit D–278.

52. If there is a proper response to an Office Action, a trademark Examiner may reverse his or her position even though a refusal to register was issued initially for confusing similarity. Hynak, 11/02/95, p. 60. Numerous examples of registered trademarks for apparel, fashion and cosmetic items in actual use that utilize the word "miracle" as part of their trademark or trade name were introduced in evidence during the course of trial.[4]

53. A mark registered on the Principal Register of the Patent and Trademark Office, such as Plaintiffs' MIRACLESUIT Registration (Exhibit P–1), is presumptively valid and enforceable. Hynak, 11/02/95, p. 78:3–6. Trademark registrations in classes other than class 25 (covering apparel, including swimsuits) are unrelated to the products at issue in this case. Hynak, 11/02/95, p. 87:12 to p. 88:25. The word "miracle" is not among the 5,000 most frequently used English words. Ross, 11/03/95, p. 44:12 to p. 45:15. The Patent and Trademark Office, by not requiring a disclaimer of the word "miracle" in trademark registrations on the Principal Register, recognized that "Miracle," as part of the phrase "The Miracle Bra," is a protectable word. Hynak, 11/02/95, p. 95:9–18.

54. Prior to the filing of the lawsuit by A & H Swimwear, all MIRACLESUIT swimsuits had a sewn-in label bearing the SWIM SHAPER name only. Plaintiffs decided to use a sewn-in tag bearing the MIRACLESUIT name in August or September, 1994. Plaintiffs subsequently commenced actually using the new sewn-in label in June, 1995, to avoid a change in the middle of the swimsuit season. M. Waldman, 10/27/95, p. 96:19 to p. 94:4; Exhibit P–30. Plaintiffs' decision to use a hangtag on MIRACLESUIT swimsuits came no later than August 15, 1994, the date it placed an order for the hang tags. B. Waldman, 10/25/95, p. 180–81; M. Waldman,

10/27/95, p. 138–39; Exhibits P–30, P–30B(1), D–216 p. 22:2–17, D–251.

55. Advertisements for THE MIRACLE BRA have presented the product's name either in all capital block letters or in small capital letters with the letters T, M and B alone in upper capital letters. MIRACLESUIT has sometimes been advertised with the initial letter M capitalized and the rest of the mark in lower-case letters in italicized script, and sometimes as one word with both the M and S capitalized. Exhibits D–54 to D–78, P–3A. From its inception, Plaintiffs' MIRACLESUIT trademark has often appeared in the marketplace followed by the words "by SWIM SHAPER". Hangtags affixed to the MIRACLESUIT swimsuit when it is sold in commerce variously read "MIRACLESUIT® by SWIM SHAPER®—Look ten pounds lighter in 10 seconds. The ten seconds it takes to slip it on."; or "MIRACLESUIT™ by SWIM SHAPER™—Look 10 pounds lighter in 10 seconds!" with a photograph of a model wearing the MIRACLESUIT. On the reverse side of some is the word MIRACLESUIT™ with the MIRACLESUIT silhouette design and the repeated phrase "Look 10 pounds lighter in 10 seconds". B. Waldman, 10/23/95, p. 89, p. 95; 10/25/95, p. 144–45; Exhibits P–9 A(1)–(3), A(6), B(6)–(9), P–18 A, D–F, H, K–N, P–Q, R(1)–(2); S; P–20A(1)–(3), P–20B(1)–(3), P–20C(1)–(2); P–23 (p. 1–29); P–30B(1), P–31; P–33D, P–57, P–61A (See Appendix to this decision). Mainstream's press kits promoting MIRACLESUIT label it "MIRACLESUIT by SWIM SHAPER" or "MIRACLESUIT from SWIM SHAPER". Exhibits P–36 A–E. Nevertheless, many advertisements for MIRACLESUIT SWIMSUITS never mention the SWIMSHAPER mark. B. Waldman, 10/25/95, p. 144–45.

56. VS Stores' President testified that VS Stores would probably not have been affected by an early objection from A & H concerning THE MIRACLE BRA. Nichols, 10/31/95, p.

---

4. These included MIRACLE SHAMPOO, Exhibit D–245 C–D; MIRACLE CREME, Exhibit D–245 E; MIRACLE GEL, Exhibit D–245 F; SKIN MIRACLE, Exhibit D–245 G; MIRACLE NAIL HARDENER, Exhibit D–245 H; MUD MIRACLE, Exhibit D–245 I; MIRACLE LOTION, Exhibit D–245 K; SHEER MIRACLE NON–RUN KNEE HIGHS, Exhibit D–245 L; MIRACLE T-Shirt and Hat, Exhibit D–245 M; MIRACLE STRETCH PANTY HOSE, Exhibit D–245 N; and MIRACLE BOOST JEANS, Exhibit D–245 O.

153:3–24; Nichols Depo, Exhibit P–205, 09/07/95, p. 122:24 to p. 123:6. VS Stores has maintained throughout this litigation that the lawsuit is unfounded, and that neither the suit nor the Patent and Trademark Office's Refusal of VS Stores' application for THE MIRACLE BRA for swimwear has had any effect on VS Stores' decision regarding THE MIRACLE BRA. Nichols Depo, Exhibit P–205, 09/07/95, p. 61:16–24, p. 67:6–14; Nichols, 10/31/95, p. 153:25 to p. 154:8. Felder, 11/01/95, p. 84:6 to p. 85:22. VS Catalogue's CEO has stated her belief that the instant action was mere "silliness." Fedus Depo, Exhibit P–201, 08/09/95, p. 80:2–6 p. 80:8. VS Catalogue's Chief Financial Officer concurred in that belief. Deckop Depo, Exhibit P–204, 08/10/95, p. 150:19–21. VS Catalogue has no plans to change any aspect of the sale or promotion of THE MIRACLE BRA products. VS Catalogue's CEO asserts that Defendants have an unfettered right to use THE MIRACLE BRA trademark on any other product. Fedus, 11/01/95, p. 203:6–18, p. 212:3–10, p. 214:5–14. Defendants have continued to add products to their line of MIRACLE products after the initiation of this suit. Felder, 11/01/95, p. 136:20 to p. 137:22:19, p. 204:10 to p. 205:23.

57. Plaintiffs concede they do not have the exclusive right to the word "miracle". B. Waldman, 10/27/95, p. 26:25 to p. 30:7. Plaintiffs do seek to enjoin Defendants' use of their trademark THE MIRACLE BRA on the basis of likelihood of confusion with MIRACLESUIT. The word "miracle" does not and has not at any time appeared by itself on any of Plaintiffs' hang-tags, sewn-in labels, promotional materials or advertisements. Plaintiffs do not own a trademark registration for the word "miracle" alone and have not at any time applied to register the word "miracle" by itself. Plaintiffs are not presently seeking to stop anyone other than Defendants from using the word "miracle". B. Waldman, 10/26/95, p. 192; 10/27/95, p. 28–30, p. 67, p. 173–75; Exhibits D–252 A–D, D–255).

## H. ADVERTISING CAMPAIGNS

58. Advertisements for the MIRACLE-SUIT typically show a woman wearing a swimsuit photographed from the knees up with the entire swimsuit visible. Exhibits P–9A(1), P–9A(4), P–9A(6); P–9B(1), P–B(2), P–9BB(5)–(8); P–18(A)–(S)). Plaintiffs also frequently use a logo on their hangtag consisting of a silhouette of a woman with her arms raised and, through a shading technique, showing the presumed slimming effect MIRACLESUIT has on the waist and hips. A & H's name does not appear on any hangtags, sewn-in labels, or the garment itself. Neither does the A & H name usually appear in advertising, promotional materials or publicity for MIRACLESUIT. Like their hangtags, Plaintiffs' advertisements for MIRACLESUIT often include the trademark, the suit's slimming feature and the tag line "Lose ten pounds in ten seconds/the ten seconds it takes to put the suit on". Exhibits P–20(A)(1), P–30(B)(1), P–31. Advertisements for THE MIRACLE BRA primarily consist of a photograph of a woman wearing THE MIRACLE BRA with emphasis on her cleavage. Mabe, 10/31/95, p. 235:24 to p. 236:12; Nichols, 10/31/95, p. 130:6–7; Exhibits D–1, D–6 to D–9, D–11A to C, D–12, D–13, D–24, D–28 to D–31. While there have been special themes such as Valentine's Day, the focus of THE MIRACLE BRA advertising has consistently been the woman's bust. Mabe, 10/31/95, p. 236:3–5. On occasion, the word "the" was dropped in promotional material for THE MIRACLE BRA, such as "There is only one miracle bra." Felder, 11/01/95, p. 108:25 to p. 109:1; Exhibit D–8, D–9.

59. Consumer advertising of the MIRACLESUIT swimsuit, has included: (1) Advertisements on point-of-sale displays in retail stores and in national consumer magazines during 1993–95. B. Waldman, 10/23/95, p. 132:2–9, p. 158:24 to p. 160:19; 10/24/95, p. 116:18 to p. 118:25, p. 119:9 to p. 120:7; Exhibits P–18A, P–18E, P–31; (2) Cooperative advertising with A & H's retailer customers. B. Waldman, 10/24/95, p. 108:16–22; Exhibit P–22; (3) Distribution of over 4 million bill enclosures since 1992 to department stores for further distribution to their customers. B. Waldman, 10/23/95, p. 132:9 to p. 133:4; 10/24/95, p. 122:5 to p. 123:19; Exhibit P–23; and (4) distribution of catalogues and press kits to professional buyers, editors, and publishers.

B. Waldman, 10/23/95, p. 129:22 to p. 130:8; Exhibits P–19b, p. 15, p. 41; P–3A; P–36A.

60. During its introductory promotional campaign for MIRACLESUIT swimsuits for the period 1991–93, A & H purchased advertising space on the back covers of the swimwear industry's main trade publications. B. Waldman, 10/23/95, p. 75:24 to p. 77:11, p. 128:9 to p. 129:21, p. 131:24 to p. 132:9; 10/24/95, p. 104:7 to p. 106:7; Exhibit P–20A. Plaintiffs have run MIRACLESUIT swimsuit trade advertisements during July and October of each year to coincide with the Florida and California "ISAM" annual swimsuit trade shows. B. Waldman, 10/23/95, p. 151:19 to p. 153:1; Exhibit P–16. As stated above (Finding of Fact 27), Plaintiffs purchased the front cover of *Contours* magazine in conjunction with the July 1992 "Sun and Swimwear" trade show in London. B. Waldman, 10/24/95, p. 120:8–23, p. 138:15 to p. 139:24; Felder, 11/01/95, p. 93:10 to p. 95:6; Exhibit P–33D. A & H's publicity campaign for the MIRACLESUIT also included a video news release which was placed with over 20 local and 5 national TV programs. B. Waldman, 10/23/95, p. 138:9–14; Exhibit P–19A. Mainstream has spent approximately $300,000 annually for MIRACLESUIT advertising, not counting 1995. MIRACLESUIT swimsuit advertising expenditures are greater than that of any other A & H line. B. Waldman, 10/24/95, p. 99:6–14; p. 93:6 to p. 95:4; p. 103:25 to p. 104:1. Exhibit P–24.

61. MIRACLESUIT swimsuits have been "featured" or mentioned in newspaper and magazine articles throughout the country. These features were independently created by the publications and therefore were not paid for by A & H. B. Waldman, 10/24/95, p. 129:8 to p. 133:20, p. 147:2 to p. 150:16; Exhibits P–11, P–18B. Both MIRACLESUIT and THE MIRACLE BRA Bikini have been mentioned several paragraphs apart in an article that appeared in numerous newspapers. Felder, 11/01/95, p. 122:6 to p. 123:25; Exhibit P–338. MIRACLESUIT swimsuits have also been featured or mentioned on local and national TV news

broadcasts and talk shows. B. Waldman, 10/24/95, p. 151:2 to p. 156:20; Exhibit P–43. A & H's public relations expert testified that the publicity campaign for MIRACLESUIT swimsuits created 23 million "consumer impressions" in 1992 and 142 million in 1995. Matusky, 10/25/95, p. 18:11–15; Exhibit P–315. He also testified that a comparable cost of advertising space and time equivalent to the space and time which MIRACLESUIT swimsuits received would be $560,000. Matusky, 10/25/95, p. 12:6–14; Exhibit P–315. He stated an equivalent value for the space and time received for all of the publicity devoted to the MIRACLESUIT swimsuit, would exceed $1.5 million. Matusky, 10/25/95, p. 15:14–24. The MIRACLESUIT publicity campaign was apparently successful in terms of quantity and quality of its placements as evidenced by the frequent mention of the swimsuit's control features in articles and broadcasts. Matusky, 10/25/95, p. 14:20 to p. 17:14, p. 25:12 to p. 26:3; Exhibit P–315;

62. Free publicity is generally determined in the public relations field by applying a multiplier of from 3 to 10 to the cost of the advertising space or broadcast time devoted to the product. Plaintiffs' expert applied a multiplier of 3.[5] Matusky, 10/25/95, p. 19:9–14; Exhibit P–315. In evaluating the publicity value of the space and time devoted to MIRACLESUIT swimsuits, plaintiffs' expert reviewed eighty-five out of hundreds of articles and a subset of the TV broadcasts which have publicized MIRACLESUIT swimsuits. The majority of the print clippings reviewed dated from 1992. Matusky, 10/25/95, p. 20:11 to p. 21:20; Exhibit P–315. The expert testified there is an approximate three-year residual effect of articles, news and feature stories. Matusky, 10/25/95, p. 40:19 to p. 46:12; Exhibit P–317.

63. The introduction of THE MIRACLE BRA was similarly accompanied by a large and continuing promotional campaign that included an introductory nationwide media tour. Felder, 11/01/95, p. 8:17–25, p. 32:20 to p. 33:17, p. 34:23 to p. 35:10, p. 50:18 to p. 55:25; p. 135:1–16; Mabe, 10/31/95, p. 235:4–

---

**5.** Defendants themselves use a more liberal multiplier of 5 to evaluate their own publicity. Matusky, 10/25/95, p. 27:8 to p. 28:24; Exhibit P–334.

19, p. 244:4 to p. 245:7; Nichols, 10/31/95, p. 129:5–10, p. 129:21–25; Exhibits D–27, D–23, D–79, D–82, D–276. THE MIRACLE BRA has become a familiar trademark in a relatively short time. Felder, 11/01/95, p. 16:18–22, p. 140:11–18; Mabe, 10/31/95, p. 235:22–23. THE MIRACLE BRA has been marketed through in-store promotions such as photography and signs used in VS Stores' windows and interiors. Mabe, 10/31/95, p. 235:7–11; Exhibit D–2 to D–5, D–7 to D–10. In March 1994, VS Stores dedicated two large windows in all stores to THE MIRACLE BRA. Felder, 11/01/95, p. 15:12–21; Exhibit D–10. VS Stores also mailed a postcard announcing the launch of THE MIRACLE BRA to 1.5 million of its customers. Felder, 11/01/95, p. 19:2–12; Exhibit D–19. In September 1994, another postcard was sent to about 140,000 persons. Felder, 11/01/95, p. 22:23 to p. 23:16; Exhibit D–6. The marketing, sale, and publicity and advertising campaign for THE MIRACLE BRA all began after November 19, 1992, the date VS Stores received search results disclosing numerous MIRACLE trademarks (including A & H's MIRACLESUIT registration). Felder, 11/01/95, p. 91:23 to p. 92:13.

64. In June, 1994, VS Stores first tested print advertising in New York for THE MIRACLE BRA. Advertisements ran in *People, The New York Times Magazine, New York Magazine,* and elsewhere. Felder, 11/01/95, p. 20:20–24; Exhibit D–1. In the last year, VS Stores devoted five major window displays to THE MIRACLE BRA. Felder, 11/01/95, p. 16:8–9; Exhibits D–11A, D–12, D–13. VS Stores launched THE MIRACLE BRA television advertising campaigns in the fall of 1994 and spring of 1995. In-store promotions began in 1994 and magazine advertisements in the spring of 1995. Felder, 10/26/95, p. 84:21 to p. 85:2,; Nichols Depo, Exhibit 205, 09/07/95, p. 90:7–10; Nichols, 10/31/95, p. 142:15 to p. 143:4; Felder, 11/01/95, p. 41:15 to p. 42:8; Exhibit P–147. Press kits have been sent to fashion editors, television stations and newspapers to generate interest in THE MIRACLE BRA products. Nichols, 10/31/95, p. 132:2–16; Exhibit D–25.

65. VS Catalogue began selling THE MIRACLE BRA (bra) in February, 1994. It has since appeared in nearly all of their catalogues. Fedus, 11/01/95, p. 163:5–16. VS Catalogue has incurred $5,997,542 in direct Catalogue costs for THE MIRACLE BRA. Fisher, 11/02/95, p. 33:1–8; Exhibit D–105. Two or three pages of each catalogue feature THE MIRACLE BRA or related products. Fisher, 11/02/95, p. 32:15–16. The average cost to produce a page in the catalogue is $.0065 to $.0070. Fisher, 11/02/95, p. 32:17–20.

66. Between February, 1994 and May, 1994, when Plaintiffs first learned of VS Catalogue's use of the mark THE MIRACLE BRA for use with bras, at least four issues of the Victoria's Secret Catalogue (approximately 20–25 million catalogues) had been distributed nationwide. Berkman, 11/01/95, p. 225:4–18. From February, 1994 to December, 1994, about 15 issues of the Victoria's Secret Catalogue had been distributed, totalling approximately 150 million. Berkman, 11/01/95, p. 225:21 to p. 226:3. From February, 1994 through June, 1995, when Plaintiffs moved for a preliminary injunction, approximately 300 million catalogues had been circulated. Berkman, 11/01/95, p. 226:9–14; Fisher Depo, Exhibit P–202, 08/09/95, p. 53:8–17, p. 63:10–18. From VS Catalogue's introduction of THE MIRACLE BRA in February, 1994 through the time of trial, approximately 400 million catalogues had been distributed. Fisher, 11/02/95, p. 33:9–16; Exhibit D–276. Over 90 percent of the 400 million catalogues mailed by VS Catalogue during this time featured THE MIRACLE BRA. Fisher, 11/02/95, p. 33:23–24.

67. VS Stores spent $3.4 million in 1994 and $5 million in 1995 (post-complaint) on THE MIRACLE BRA for outside advertising, and $1 million for in-house promotion during 1994 to 1995. VS Catalogue's advertising expenditures for THE MIRACLE BRA have been $4 million, calculated as the percentage of catalogue space devoted to THE MIRACLE BRA products out of total catalogue expenses of $200 million. Exhibit P–127, 07/14/95, No. 10; Felder, 11/01/95, p. 50:7–10; Exhibit D–276; D–281. The total expenditures by VS Stores for advertising

and promotion directly associated with THE MIRACLE BRA since its launch exceed $9,295,000. Deckop, 10/31/95, p. 223:3–16; Felder, 10/26/95, p. 84:10–12. This represents approximately 10–20 percent of VS Stores' total advertising budget. Deckop, 10/31/95, p. 223:23–24. Approximately 60 percent of VS Stores' total advertising for Fall, 1994, was devoted to THE MIRACLE BRA. Deckop, 10/31/95, p. 246:13–19; Exhibit D–265, No. 10. VS Stores planned to spend fifteen percent of its advertising budget for advertising and promotion of THE MIRACLE BRA in 1995. Deckop, 10/31/95, p. 224:7 to p. 225:10; Felder, 10/26/95, p. 84:9–12; Exhibit P–147.

## I. SALES AND PROFITS

68. With the exception of Mainstream during 1991—the MIRACLESUIT swimsuit's first year of sales—both A & H and Mainstream have earned consistent positive net profits on their MIRACLESUIT swimwear line. M. Waldman, 10/27/95, p. 135:11 to p. 137:14; Exhibit P–24. 1995 sales of MIRACLESUIT products at the time of trial represented 10 percent of A & H's dollar sales. B. Waldman, 10/27/95, p. 69:25 to p. 70:16. Of the approximately 4 million total swimsuits that A & H Sportswear manufactures annually, MIRACLESUITs constituted 1.7 percent in 1992, 3.1 percent in 1993, 4.3 percent in 1994 and (as of August 31, 1995) 4.9 percent in 1995. B. Waldman, 10/25/95, p. 168, p. 172–73; 10/26/95, p. 125–26; Exhibit D–233, D–242. Because A & H charges a higher premium to Mainstream for MIRACLESUIT than for other swimsuit sales, A & H considers MIRACLESUIT its most profitable line. B. Waldman, 10/23/95, p. 69:17–23. Plaintiffs spend more on advertising MIRACLESUIT than on any other brand. B. Waldman, 10/24/95, p. 103:22 to p. 104:4. Since VS Stores' launch of THE MIRACLE BRA, Plaintiffs' sales of MIRACLESUIT have steadily increased. As of August 31, 1995, sales for 1995 represented the highest year-end total since the inception of the MIRACLESUIT. B. Waldman, 10/27/95, p. 49–50; Exhibit D–233.

69. THE MIRACLE BRA is among the top five items sold by VS Stores. Nichols, 10/31/95, p. 132:23, p. 140:17–19. VS Stores' total sales of all THE MIRACLE BRA products from inception through August, 1995 were $140,446,000. Total sales of THE MIRACLE BRA for bras alone were $132,222,000. Sales of other merchandise on which THE MIRACLE BRA trademark was used totalled $8,224,000, including swimwear ($1,183,000) and bodysuits ($7,041,000). Deckop, 10/31/95, p. 171:23 to p. 172:19; Exhibit D–265. VS Stores' sales of THE MIRACLE BRA merchandise up to December, 1994 (when this action was filed) totalled approximately $74,649,000. Deckop, 10/31/95, p. 172:22 to p. 173:2; Exhibit D–265. VS Catalogue's sales of THE MIRACLE BRA totalled more than $2.3 million as of May, 1994. Fisher, 11/02/95, p. 36:16 to p. 37:12. THE MIRACLE BRA products constitute 4 percent of VS Catalogue's gross sales. Fisher, 11/02/95, p. 35:6–24. Sales of THE MIRACLE BRA products throughout the various stages of this litigation were set forth in confidential Court Exhibit 3. Fisher, 11/02/95, p. 37:17–22, p. 34:3–7, p. 37:23–25; Exhibits C–3, D–105. The figures therein reflect over two and a half million units sold. Fisher, 11/02/95, p. 34:21–22.

70. VS Catalogue also considers THE MIRACLE BRA Bikini and swimwear successful. Berkman, 11/01/95, p. 234:20–22; Weiss, 11/02/95, p. 7:1–3. In 1994, swimwear accounted for over $20 million dollars of VS Catalogue's sales, constituting a sizable part of its business. Fedus, 11/01/95, p. 170:19–20. Swimwear represents approximately 4 to 5 percent of VS Catalogue's total sales. THE MIRACLE BRA Bikini and other swimwear in turn accounted for about one-third of VS Catalogue's swimwear sales in 1995. Fedus, 11/01/95, p. 172:11–14. THE MIRACLE BRA Bikini contributed in large part to VS Catalogue's increase in swimwear sales in 1995. Fedus, 11/01/95, p. 171:6–9. Through August, 1995, VS Catalogue earned more than $10.3 million from sales of THE MIRACLE BRA swimwear. Exhibit D–105. VS Catalogue projected swimwear to gross over $30 million dollars in sales for 1995. Fedus, 11/01/95, p. 170:21–22.

*J. CONFUSION*

71. At trial, witnesses testified to several instances of actual confusion between the parties' marks in issue. J. Russel Sacco—an independent sales representative of the MIRACLESUIT product line for Arizona, California, Hawaii and Nevada—witnessed incidents among professional buyers whom he considers more knowledgeable than the average consumer about the swimwear industry and its brands. Sacco, 10/24/95, p. 83:13–20. These included: (1) A visit to Mr. Sacco's showroom (at which the MIRACLESUIT trademark is displayed on the front door) in February, 1995 by a professional swimwear buyer for the Armoire catalogue company who inquired whether he carried THE MIRACLE BRA swimsuit, which she had seen advertised in the New York Times. Mr. Sacco responded that he carried the MIRACLESUIT line of swimsuits and the buyer replied that that was the product she had been looking for. Sacco, 10/24/95, p. 55:18 to p. 56:16, Exhibit P–18S; (2) In May, 1995, during a television advertising campaign for THE MIRACLE BRA, a professional swimwear representative familiar with the MIRACLESUIT swimsuit line asked him whether the MIRACLESUIT company was involved with that campaign. Sacco, 10/24/95, p. 56:25 to p. 57:20; (3) During an airplane flight in August, 1995, a former professional swimwear buyer for Foley's department store in Texas asked Mr. Sacco whether MIRACLESUIT swimsuits incorporated an enhanced bra which she stated she had heard much about. Sacco, 10/24/95, p. 58:10 to p. 59:10; and (4) A woman from the Malibu Style company called Mr. Sacco in October, 1994 to make an appointment to view THE MIRACLE BRA line. Sacco, 10/24/95, p. 59:13 to p. 60:2.

72. Mainstream's receptionist at its New York City showroom where suits are sold to commercial buyers also witnessed incidents relating to confusion between the parties' products; these included a January 1995 telephone inquiry and a Spring 1995 walk-in inquiry concerning THE MIRACLE BRA swimsuits. Oginz, 10/26/95, p. 111:15 to p. 113:7, p. 114:14 to p. 115:19, p. 116:22 to p. 118:24. In November, 1994, Mr. Bruce Waldman discussed terminating A & H's public relations agency with one of that agency's principals. During the conversation she stated she thought that the MIRACLESUIT and THE MIRACLE BRA were both made by A & H. B. Waldman, 10/25/95, p. 121:14 to p. 123:13. In July, 1994, at a trade show in Florida, Mr. Mark Waldman inquired of buyers visiting the MIRACLESUIT showroom, whether they were already familiar with the MIRACLESUIT swimsuit. One buyer responded that it made a woman's bust look bigger. M. Waldman, 10/27/95, p. 122:7 to p. 123:15.

73. At least one television news program has referred to both the Miracle Bra and the Miracle Swimsuit in the same sentence ("First there was the Miracle Bra, then the Miracle Swimsuit now the Miracle Jeans ..."). Exhibit P–44; B. Waldman, 10/25/95, p. 117:10 to p. 119:6. An article in Women's Wear Daily, appearing in February 1995, referred to "the introduction of the Miracle Swimsuit in the upcoming Victoria's Secret Catalog." Exhibit P–63; B. Waldman, 10/25/95, p. 115:14 to p. 116:9. Newspaper articles in general circulation have discussed both the MIRACLESUIT and MIRACLE BRA BIKINI, mentioning both names in the same article.[6] B. Waldman, 10/25/95, p. 121:5–9; Exhibit P–48.

---

**6.** Following trial, and during our consideration of this case, an article in one of the largest papers in plaintiffs' principal place of business concerning the upcoming swimwear season's fashions came to our attention. The article erroneously stated:

> Swimsuit designers increasingly have taken into consideration that not all figures are flawless and they've developed "miracle swimsuits"—shape flattering outfits that *take their cue from the Miracle Bra concept ... New this*

*summer is Miraclesuit Swimwear,* which the manufacturer claims can instantly make "the woman look 10 pounds thinner while feeling secure, confident and comfortable."

Polly Rayner, *Well–Suited; Designers use new techniques, fabrics to flatter figures,* The Morning Call, 2/22/96, at D1 (emphasis added). While we base neither our legal analysis or conclusions on this article, we believe it may well reflect the public's awareness of differences and similarities of the products at issue in this suit.

### K. TIMING OF SUIT

74. A & H had been aware of Defendants' use of THE MIRACLE BRA for use with bras between February and May 1994 and of THE MIRACLE BRA for use with swimsuits for approximately one month when its Complaint was filed on December 8, 1994. This was also within about one month of the first appearance of THE MIRACLE BRA swimsuit in VS Catalogue's catalogue. B. Waldman, 10/25/95, p. 126:9 to p. 127:10; 10/27/95, p. 56:5 to p. 57:6, p. 81:2–4; M. Waldman, 10/27/95, p. 119:24 to p. 120:11; Weiss Depo, Exhibit P–200, 08/07/95, p. 51:12–23; Berkman Depo, Exhibit P–203, 09/13/95, p. 58:8–19; Exhibit D–224, Int. No. 23. Soon after Mark Waldman first became aware of Defendants' use of THE MIRACLE BRA for bras in the spring of 1994 upon seeing it in VS Catalogue's catalogue, he called A & H's trademark attorney to discuss the matter. M. Waldman, 10/27/95, p. 119:24 to p. 120:11.

75. A & H refrained from immediately bringing suit against Defendants for use of THE MIRACLE BRA for use with bras for numerous reasons. These included: (1) VS Catalogue was a former customer and potentially an important future customer, although VS Catalogue had not purchased from A & H since purchasing MIRACLESUIT swimsuits in 1992. A & H has had the experience of developing good customers from retailers who have tried A & H swimsuits a second time after once discontinuing them; (2) A & H has not been a litigious company during its 50–year lifespan; (3) The expense of litigation; (4) The demands on A & H's principals' time; (5) The risk of a declaratory judgment action by Defendants; and (6) The uncertainty as to whether Defendants would persist in their use of MIRACLE marks, or whether the first appearance in the VS Catalogue of which A & H became aware, was an isolated instance. B. Waldman, 10/24/95, p. 25:14 to p. 25:20; 10/25/95, p. 126:9 to p. 128:12; 10/27/95, p. 75:6–12; M. Waldman, 10/27/95, p. 120:12 to p. 121:23, p. 159:10 to p. 160:6, p. 172:7–20; Exhibit P–49G.

## III. DISCUSSION

### A. EXAMINING ATTORNEY'S DECISION

■ Plaintiffs filed this action in December, 1994, approximately one month after they became aware of Defendant's extension of their THE MIRACLE BRA trademark into swimwear. Following a February 1995 refusal to register, Defendants' requested that the application process of its THE MIRACLE BRA Bikini be suspended. We therefore have not had the benefit of a final decision by the Patent and Trademark Office to guide our decision here.[7] However, although no final adjudication has occurred, an initial determination of issues central to this case was made by an examining attorney at the PTO during consideration of Defendants' application. While not binding on us here, we nonetheless believe the examining attorney's decision deserves our full consideration. We are guided by the well established rule of *Morgan v. Daniels*, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894) which held:

> [W]here the question decided in the Patent Office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon the question of fact in any subsequent suit

---

7. Indeed, under the doctrine of primary jurisdiction, we could have declined entirely to address this case prior to trial. That doctrine dictates "that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). *See also Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973); *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1162 (3d Cir. 1993); *Puerto Rico Maritime Shipping Authority v. Valley Freight Systems, Inc.*, 856 F.2d 546, 549 (3d Cir.1988); *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir.1983); *U.S. v. Bessemer & L.E.R. Co.*, 717 F.2d 593, 599 (D.C.Cir.1983); *F.P. Corp. v. Ken Way Transp., Inc.*, 848 F.Supp. 1181, 1185 (E.D.Pa.1994); *Driving Force, Inc. v. Manpower, Inc.*, 498 F.Supp. 21, 25 (E.D.Pa.1980); *Montgomery, etc. v. Washington Suburban San. Com'n*, 607 F.2d 378, 381 (D.C.Cir.1979); *Miss. Power & Light v. United Gas Pipe Line*, 532 F.2d 412, 417 (5th Cir.1976). Although it was within our discretion to do so, in the interests of timely and non-duplicative adjudication, we nonetheless have not invoked the doctrine in this matter.

between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction ... [I]f doubtful the decision of the Patent Office must control.

*Id.*, at 125, 14 S.Ct. at 773. The rule of *Morgan v. Daniels*, has more recently been reaffirmed in the Third Circuit and elsewhere. *See Radio Corp. of America v. International Stand E. Corp.*, 232 F.2d 726, 729 (3d Cir.1956) (acknowledging strict injunction laid down by *Morgan v. Daniels*, that the patent office's finding is not to be disturbed unless there is "thorough conviction" that a mistake has been made); *S. & S. Corrugated Paper Mach. Co. v. George W. Swift, Inc.*, 176 F.2d 358, 360 (3d Cir.1949); *Standard Oil Co. v. Montedison*, 664 F.2d 356, 362 (3d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *Stamicarbon, N.V. v. Chemical Const. Corp.*, 544 F.2d 645, 647 (3rd Cir.1976); *Miles Shoes, Inc. v. R.H. Macy & Co., Inc.*, 199 F.2d 602, 603 (2nd Cir.1952), *cert. denied*, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953); *Carling Brewing Company, Inc. v. Philip Morris, Inc.*, 277 F.Supp. 326, 333 (N.D.Ga.1967). *Contra, John Morrell & Co. v. Doyle*, 97 F.2d 232, 235 (7th Cir.1938), *cert. denied*, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415 (1938).

It is true that the case before us is one of alleged trademark infringement in violation of §§ 32 and 43 of the Lanham Act, 15 U.S.C. § 1051 et seq., and not—as was the case in *Morgan v. Daniels*—a question of patent priority. Nonetheless, the principle laid down in *Morgan* is equally applicable to trade marks. *Century Distilling Co. v. Continental Distilling Co.*, 106 F.2d 486, 489 (3d Cir.1939), *cert. denied*, 309 U.S. 662, 60 S.Ct. 581, 84 L.Ed. 1010 (1940) (citing *United States ex rel. Baldwin Co. v. Robertson*, 265 U.S. 168, 44 S.Ct. 508, 68 L.Ed. 962 (1924)).

While we are therefore mindful of giving proper consideration to the PTO's examining attorney's decision, we are also aware of the preliminary nature of that determination, and appraise it in that context. *See U.S. Treasury v. Synthetic Plastics Co.*, 341 F.2d 157 (CCPA 1965) (the term "decision" when used in context of review by Court of Customs and Patent Appeals, means "a disposi-tive decision in which a right has been adjudicated"). In our consideration of this case, we have not come to believe Defendants' actions with respect to Plaintiffs' MIRACLE-SUIT were willfully tortious. Rather, we surmise that these actions at most amounted to a "decision to take the risk of coming very close to infringement, for the sake of a trade name defendant evidently believed would be more valuable to it than any of the available alternatives." *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 52 (S.D.N.Y.1970), *aff'd*, 437 F.2d 566 (2nd Cir. 1971) (citations omitted). "While a preliminary Patent Office determination is not binding upon either this court or a trademark applicant, it is entitled to "substantial weight" on the part of both." *Id.* We turn now to the examiner's decision.

In the office action dated February 27, 1995, the examining attorney concluded that there was a likelihood of confusion between Defendants' THE MIRACLE BRA Bikini and Plaintiffs' MIRACLESUIT for swimwear; and refused registration. Exhibit P–115, at 1. In reaching that conclusion, the examining attorney conducted a two-step analysis. First, she looked at the marks themselves for similarities in appearance, sound connotation and commercial impression. *Id.*, citing *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 U.S.P.Q. 563 (CCPA 1973). Second, the examining attorney compared the goods or services to determine if they are related or if the activities surrounding their marketing are such that confusion as to origin is likely. Exhibit P–115 at 1, citing *In re August Storck KG*, 218 U.S.P.Q. 823 (TTAB 1983); *In re International Telephone and Telegraph Corp.*, 197 U.S.P.Q. 910 (TTAB 1978); *Guardian Products Co. v. Scott Paper Co.*, 200 U.S.P.Q. 738 (TTAB 1978).

In comparing THE MIRACLE BRA and MIRACLESUIT marks, the examining attorney appropriately considered the marks in their entireties recognizing that greater weight is given to a dominant feature in determining whether there is a likelihood of confusion. Exhibit P–115, at 2, citing *In re National Data Corp.*, 753 F.2d 1056, 224 U.S.P.Q. 749 (Fed.Cir.1985); *Tektronix, Inc.*

*v. Daktronics, Inc.*, 534 F.2d 915, 189 U.S.P.Q. 693 (CCPA 1976); *In re J.M. Originals Inc.*, 6 U.S.P.Q.2d 1393 (TTAB 1988). Following her review, the examining attorney concluded:

> The registrant's mark is MIRACLESUIT. The SUIT portion of the mark is descriptive of the type of clothing, in this case, swimsuits. The dominant part of the registered mark is MIRACLE. The dominant part of the applicant's mark is MIRACLE. These dominant parts are identical. When the applicant's mark is compared to a registered mark, "the points of similarity are of greater importance than the point of difference." *Esso Standard Oil Co. v. Sun Oil Co.*, 229 F.2d 37, 108 U.S.P.Q. 161 (D.C.Cir.), *cert. denied*, 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491, 109 USPQ 517 (1956).

In the second stage of her analysis, the examining attorney compared the MIRACLE-SUIT and THE MIRACLE BRA product classifications and determined:

> The applicant seeks to register its mark for goods in international class 25 for "swimsuits, bathing suits and bikinis." Registrant[ A & H]'s goods are also under international class 25 for "swimwear." The applicant's goods include the same goods as their registrants; swimsuits, bathing suits and bikinis are types of swimwear. Because of the confusing similarity between the registrant's mark, MIRACLESUIT and the applicant's mark THE MIRACLE BRA and the identical class and nature of the goods the, [sic] applicant's mark would cause consumer confusion to the source of goods.

Patent and Trademark Office Action, Feb. 27, 1995, Exhibit P–115.

This initial determination does not limit our de novo review of the issues raised in this litigation. Rather, a thorough reading and understanding of the examining attorney's decision has been one of many factors, in addition to the applicable common law standards, which have guided our consideration of this case. We apply these standards in detail below.

## B. EXPERT OPINIONS AND SURVEYS

During the course of the two-week trial, we received into evidence several survey reports conducted by experts for both Plaintiffs and Defendants purporting to measure or relate to the level of confusion in the marketplace amongst consumers. Exhibits P–305, P–306, P–315, P–317, P–323, P–325, P–333, P–337, D–211, D–243, D–244, D–247. We also heard testimony from numerous experts concerning their survey research. We have weighed the opinions of these experts against each other and reviewed the testimony in detail. We find neither side dispositive in reaching our conclusions here.

The parties' surveys have focused on comparing THE MIRACLE BRA *bra* with the MIRACLESUIT *swimsuit*. As an example, Plaintiffs' survey expert, Daniel Callahan assumed that the MIRACLESUIT *swimsuit* and THE MIRACLE BRA *swimsuit* would be confusing prior to conducting a survey on whether THE MIRACLE BRA and the MIRACLESUIT trademarks in question may cause confusion among consumers. Callahan, 10/30/95, p. 21, p. 48. Defendants also have attempted to show how their bras are not likely to produce confusion in relation to Plaintiffs' swimsuits. Fouss, 11/02/95, p. 148:1–5; Exhibit D–205.

Defendants' expert, Mr. Hynak's affidavit discussed his review of the PTO's Principal Register, which included a number of trademark registrations that have either been canceled, not renewed, or abandoned. These marks are no longer registered with the PTO, and are probably not in use in commerce. Hynak, 11/02/95, p. 80:7 to p. 81:12, p. 84:10 to p. 85:10, p. 86:5 to p. 87:18. Nonetheless, based on his review of the Register, he concluded that "miracle" is a weak mark. Hynak, 11/25/95, p. 98, p. 106. He also recognized no dominant portion of THE MIRACLE BRA mark notwithstanding the fact that the examining attorney required Defendants to disclaim any exclusive right to use the word BRA apart from their mark. Exhibit P–115, p. 3. Defendants' expert did not review the marketplace before reaching that conclusion. Hynak, 11/02/95, p. 78:7 to p. 79:11, p. 81:13 to p. 82:3, p. 114. Mr. Hynak stated only that he personally had not

encountered MIRACLE products in the marketplace—other than those at issue in the present case—in either the swimwear or lingerie fields. Hynak, 11/02/95, p. 90:8–12, p. 98:18 to p. 99:2.

Plaintiffs' public relations expert, Gregory Matusky, did not evaluate the actual public perception of the MIRACLESUIT. While Defendants assert there is therefore no basis for evaluating public recognition of MIRACLESUIT, they simultaneously point to their own publicity tour for THE MIRACLE BRA as successful. Matusky, 10/25/95, p. 48; Exhibit P–315. We believe both companies engaged in substantial promotion activities and both efforts undoubtedly resulted in increased public recognition for the respective products.

We understand the litigation strategy of both parties and the inherent difficulties in quantifying marketplace reality for our purposes here. However, we find the surveys presented of only limited utility. In light of our conclusions below, survey research that would have more ably guided our consideration of issues raised by this litigation might have measured rather than assumed confusion between THE MIRACLE BRA swimwear and the MIRACLESUIT swimsuits and the basis, if any, in marketplace reality for such confusion. We are respectful of the expertise both parties brought before us and we also appreciate the vehemence with which their experts challenged each other's procedures and conclusions. We are unable to conclude that with respect to the question of the likelihood of confusion arising between the parties' *swimwear products,* that any one set of those opinions—to the exclusion of opposing arguments—was based on sufficiently sound reasons, judgment and information necessary to sway our opinion. We have therefore concluded that the facts we have found and the case law of this circuit and other federal courts must be of chief importance in guiding our analysis herein.

## C. *LIKELIHOOD OF CONFUSION*

■ The standard to apply in this Circuit to determine likelihood of confusion in a

trademark infringement claim [8] was set forth in *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3d Cir.1978). The factors to be considered by the trial court are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised though the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Id.,* 589 F.2d at 1229. After an exhaustive review of the record and thorough consideration of the parties' arguments, we apply this standard below, recognizing that the burden of proof is on the Plaintiffs to establish likelihood of confusion. *See Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 292 (3d Cir.1991), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Opticians Ass'n v. Independent Opticians,* 920 F.2d 187 (3d Cir.1990).

### 1. *Similarity of Marks*

■ "Perhaps the most important of these factors is the first one on the *Scott Paper* list ... [I]f the overall impression created by marks is essentially the same, it is very probable that the marks are confusingly similar." *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 293. We do not believe that the overall impression created

---

**8.** Plaintiffs claims of trademark infringement under § 32(1) and unfair competition under § 43(a) of the Lanham Act are substantively equivalent and we believe our discussion below applies equally to both claims.

by THE MIRACLE BRA *bra* and MIRACLESUIT *swimsuit* is essentially the same.

In refusing registration of THE MIRACLE BRA for swimwear in light of A & H's registered mark MIRACLESUIT for swimwear, the PTO Trademark Attorney concluded that the term MIRACLE was the dominant portion of both A & H's and Defendants' marks. Exhibit P–115. The Examining Attorney further stated that the disclaimed portions of THE MIRACLE BRA mark could not be considered dominant and that both the "THE" and "BRA" components of Defendants' THE MIRACLE BRA mark are significantly less important than "MIRACLE." *Id.* Ms. Fedus, VS Catalogue's CEO, also stated that the word "THE" is an unimportant component of the mark. Fedus Depo, Exhibit P–201, 08/09/95, p. 85:15–19. She subsequently stated that she did not know whether or not it was important. Fedus, 11/01/95, p. 206:4–7. Ms. Fedus stated that the words THE and BRA were not a concern to VS Catalogue's merchants and creative team when the words were omitted from copy for a MIRACLE product in the VS Catalogue. Fedus Depo, Exhibit P–201, 08/09/95, p. 86:17–22. Ms. Fedus' acknowledged that THE MIRACLE BRA products occasionally appear in advertising without "THE" or "BRA" immediately adjacent. Fedus, 11/01/95, p. 206:12 to p. 207:20; Exhibit P–136A.

VS Catalogue's Chief Financial Officer, Henry Fisher, at trial described Defendants' product line as MIRACLE, unaccompanied by THE or BRA. Court Exhibit 3, 11/02/95. Elsewhere, he testified concerning "2 or 3 pages of MIRACLE BRA or related products," also without using "THE." Fisher, 11/02/95, p. 32:15–16. Although the VS Catalogue is carefully reviewed, in the past there have been references to the "Miracle Bikini" and the "Miracle Bodysuit" which omitted the word "bra." [9] Berkman, 11/01/95, p. 236:25 to p. 237:10. Ms. Felder acknowledged that Defendants' mark is often used without "THE" if to do so would read awkwardly or be grammatically improper. Felder, 11/01/95, p. 105:2 to p. 106:23; Felder, 11/01/95, p. 107:21 to 109:1; Exhibit D–19.

■ A trademark is distinctive and capable of being protected if it either is inherently distinctive or has acquired distinctiveness through secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767–69, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615, 624 (1992). We believe a mark with MIRACLE as its dominant component is inherently distinctive and therefore protectable. Defendants produced a collection of registrations and applications incorporating the term MIRACLE. Exhibit D–277. Defendants' expert testified at trial that MIRACLE has never been disclaimed in any application or registration he has examined. In contrast, the word BRA in VS Stores' registration of THE MIRACLE BRA (bra) was required to be disclaimed by the PTO. Hynak, 11/02/95, p. 109:10 to p. 111:11. He further stated that a dominant portion of a mark would be that mark's most significant portion. Hynak, 11/02/95, p. 111:12 to p. 113:2. We therefore conclude that MIRACLE is the most significant term in defendant VS Stores' trademark THE MIRACLE BRA, with the word BRA a generic or descriptive term. As the Examining Attorney did before us, we further conclude that MIRACLE is the dominant portion of Defendants' mark THE MIRACLE BRA.

The words that follow "Miracle"—bra and suit respectively—though generic, are nonetheless descriptive of two distinct types of apparel. The Third Circuit has stated:

> When comparing two marks each must be viewed in its entirety, although one feature of a mark may be more significant than

---

9. Examples of Defendants use of MIRACLE not directly accompanied by "THE" or "BRA" or both, include: (1) MIRACLE BIKINI, Exhibit P–136B, p. 2, "Victoria's Secret London Resort Collection '95" catalog; (2) MIRACLE BODYSUIT, for lingerie, Exhibit P–136C, "VS London Winter Sale" catalog; (3) THE MIRACLE CHEMISE, Exhibit P–136A, "London Private Sale '95" catalog; (4) MIRACLE BRA, Exhibit P–123, press kit; and (5) shrink-wrap internal shipping labels for MIRACLE TANK SUIT, for swimsuits, Exhibit P–108, MIRACLE SWIMSUIT, Exhibits P–118B, P–118C, MIRACLE TOP & MIRACLE BOTTOM, Exhibit P–106, and MIRACLE PANTY, Exhibit P–111.

other features, and it is proper to give greater force and effect to that dominant feature. When the dominant portions of the two marks are the same, confusion is likely ... The descriptive portions of a mark can be disclaimed, although the entire composite mark, including the descriptive terms, is considered for purposes of infringement.

*Country Floors, Inc. v. A Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1065 (3d Cir.1991). We believe that notwithstanding the shared dominant portion MIRA-CLE, the inclusion of suit and bra, *when applied to those respective goods,* lessens any likelihood of confusion. We come to this belief fully aware that marks must be compared in the light of what occurs in the marketplace, not in the courtroom "to determine the purchasing public's state of mind when confronted by somewhat similar trademarks singly presented." *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976).

[T]he test is not whether the public would confuse the *marks,* but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected.

*Id.* See also *Smith Fiberglass Products, Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1330 (7th Cir. 1993) (upholding side-by-side comparison); *Singh v. Patel & Sons, Inc.,* 851 F.Supp. 318, 323 (N.D.Ill.1994) (some cases suggest that particularized side-by-side comparisons of the competing marks can be relevant; elsewhere the preferable marketplace evaluation looks at the entire "perceptual gestalt" or the "total concept and feel.").

Our review of all the evidence before us, our perception of consumers' likely response to the marks at issue, and our common sense leads us to conclude these marks (when considered with respect to the MIRACLESUIT swimsuit and THE MIRACLE BRA bra) are similar in that they share a dominant portion, but distinct in that in their very names they describe different products.

## 2. Strength of the term "Miracle"

■ We turn next to the strength of the word "miracle" itself. Plaintiffs maintain and Defendants dispute that the term is powerful. VS Catalogue's President stated that THE MIRACLE BRA is past its apex and is now heading down. She views the product itself, rather than the name, as important. Fedus Depo, Exhibit P–201, 08/09/95, p. 107:21 to p. 108:11. Defendants admittedly could have sold the same products under a different trademark. Felder, 11/01/95, p. 103:24 to p. 104:17; Deckop, 10/31/95, p. 205:13–21. For its first five months, THE MIRACLE BRA (bra) was marketed without any trademark. Felder, 11/01/95, p. 104:13–17.

Defendants' own promotional campaign, declaring "There is only one Miracle Bra" supports the Plaintiffs' assertion that "Miracle" is not widely used in fashion industry. Defendants' claim that when they chose the name "miracle" for their bra they were looking for something that was fresh, flirtatious, and fun. That characterization could be equally applicable to Plaintiffs' prior registered MIRACLESUIT. Defendants' inconsistent position that "miracle" is not unique and distinctive when used by Plaintiffs, but is when used by Defendants, is untenable.

Defendants' expert witness, Dr. Ivan Ross, also noted that "miracle" is not among the 5,000 most commonly used English words. Ross, 11/3/95, p. 44:25 to p. 45:15. Even if "miracle" was considered a common word, the Third Circuit has declared "[t]he significant factor is not whether the word itself is common, but whether the way the word is used in a particular context is unique enough to warrant trademark protection." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 478 (3d Cir.1994). In *Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352 (7th Cir.1983), the Seventh Circuit concluded that the word "miracle" was fanciful, revealing nothing about the mark. *Id.* at 355. ("Fanciful" is the highest category of protection available under trademark law, (Hynak, 11/02/95, p. 116:18 to p. 118:18)). We see no reason to depart from that conclusion here.

**1260**

VS Catalogue's and VS Stores' Presidents both testified that they were unaware of any party—other than the parties to this litigation—whose product used a trademark containing "Miracle" for either lingerie or swimsuits. Fedus, 11/1/95, p. 213:11–20; Nichols, 10/31/95, p. 154:9 to p. 155:3. In their various now-abandoned MIRACLE applications for registration in the PTO, Defendants made numerous claims as to the protectability of MIRACLE as a trademark. Deckop, 10/31/95, p. 199:19 to p. 201:5, Exhibits P–100C to P–100L. These applications were withdrawn after this action was filed. Defendants have also implied that the silhouette of a woman on Plaintiffs' hangtags is necessary in order to inform purchasers of the purpose of the swimsuit. If this were indeed the case, it would only help demonstrate the non-descriptiveness of the MIRACLESUIT mark and tend to show that the mark alone does not inform a purchaser of the swimsuit's body control function.

Plaintiffs seek to prevent uses of "miracle" which they claim are confusingly similar to Plaintiffs' rights in MIRACLESUIT. Plaintiffs have not asserted that they have the right to prevent all uses of the word "miracle" for every type of goods whatsoever, (Finding of Fact 57). In two weeks of trial, the Court heard only limited evidence concerning the use of "miracle" marks in the marketplace. Defendants' parade of products having "miracle" as a component of their trademarks was virtually unrelated to either lingerie or swimwear and bears little relation to the ultimate strength of the MIRACLESUIT mark. These registered marks and the goods covered by them in no way approach the degree of similarity shared by the MIRACLESUIT and THE MIRACLE BRA goods and products. Nor do they change our conclusion that the word "miracle," when applied to both swimwear and lingerie items, is a strong mark. Indeed, we are somewhat surprised to see Defendants argue herein that "miracle," a primary component of their own mark, is weak.

### 3. The Price of Goods in Issue

*Scott Paper* instructs us to look at the price of the goods and other factors indica-

tive of the care and attention expected of consumers when making a purchase. THE MIRACLE BRA frequently sells for under $20. The MIRACLESUIT swimsuit by contrast usually sells for over $50 (Findings of Fact 14 and 15). It is most difficult to quantify consumers' care and attention when choosing these goods due to the differences inherent in the products and the disparate manners in which both products are sold. We have little reason to believe that the concerns that govern the purchase of a bra would be identical to those governing a swimsuit—a garment that performs a different function. Since the bra is primarily worn as an undergarment whereas a swimsuit is not, we believe a consumer is likely to be at least slightly more concerned with comfort than appearance with the bra and vice versa with the swimsuit.

### 4. Time Before Confusion

We next look at the length of time Defendants used THE MIRACLE BRA mark before evidence of actual confusion arose. Defendants applied to register THE MIRACLE BRA trademark in December 1992; the application was registered in August, 1994, based on a first use date of January, 1994 (Finding of Fact 31). The first incident of actual confusion brought to our attention occurred in February 1995, over a year after Defendants' use of THE MIRACLE BRA for bras, yet only 2 months after THE MIRACLE BRA was extended to swimwear. We believe that it was the entry of Plaintiffs' THE MIRACLE BRA into the swimwear market that more than any other event closed the gap between the swimwear and lingerie industries at least with respect to the name "Miracle." We therefore believe that the two month period is critical to our analysis here.

### 5. Defendants' Intent

█ The next element of the *Scott Paper* analysis we consider is the intent of the Defendants in adopting their mark. At the outset, we do not find that Defendants' frequent association of their VICTORIA'S SECRET mark with THE MIRACLE BRA line alone is sufficient to show a lack of deliber-

ate infringement. *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2nd Cir.1970) (argument that Revlon's use of its well publicized name along with a contested mark indicated a lack of deliberate fraud rejected because "it would allow any company that is well enough known to infringe a competing company's mark, especially if the competitor is small, merely by coupling its own name with the competitor's mark"). Our review of the record here focuses on the MIRACLESUIT swimsuit and THE MIRACLE BRA (bra). We address the MIRACLESUIT and THE MIRACLE BRA swimwear in our discussion below concerning possibility of confusion.

■ When asked whether Defendants would have adopted THE MIRACLE BRA if she had known that the MIRACLESUIT swimsuit and trademark had been featured at a 1992 London trade show, VS Stores' previous Director of Marketing stated "If I had seen something and knew of it, I would in good conscience not even think of trying." Felder, 10/26/95, p. 54:20 to p. 55:1. Given the conditional nature of that statement, we do not agree with Plaintiffs' position that that testimony reveals Defendants' deliberate intent to infringe.

Although searches were conducted revealing other "Miracle" marks, including Plaintiffs' MIRACLESUIT, (Finding of Fact 24), Plaintiffs' have not shown Defendants intentionally chose the name MIRACLE for use with bras to ride on the success of Plaintiffs' MIRACLESUIT swimsuit. Instead, Defendants apparently conceived of their name independently (Finding of Fact 23). Neither are we persuaded by the suggestion that the presence of two representatives from the London office of The Limited, Inc. at the July 1992 Sun & Swimwear tradeshow, where MIRACLESUIT was prominently advertised, (Finding of Fact 27) is sufficient proof of intent by Defendants VS Stores or VS Catalogue to appropriate the success of the MIRACLESUIT mark. In summary, we do not find bad faith or deliberate intent has been proven.

### 6. *Evidence of Actual Confusion*

We next examine the evidence, if any, of actual confusion presented by Plaintiffs. We are mindful that this factor alone is not determinative. As the Third Circuit has stated:

> [T]he more evidence of actual confusion that a plaintiff can muster, the stronger the likelihood of confusion in the future, but lack of evidence of actual confusion at least where the time period that the two products have been in competition is short or when the particular circumstances do not indicate such evidence should have been available, does not raise an inference that there is no likelihood of confusion.

*Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 205 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995), (citation omitted). *See also Nugget Distributors Co-op. of America, Inc. v. Mr. Nugget, Inc.,* 776 F.Supp. 1012, 1023 (E.D.Pa.1991).

Confusion can be manifested in a direct mix-up of the two products (for instance, if consumers believed upon seeing THE MIRACLE BRA that they were looking at the Plaintiffs' product). We do not believe that this likelihood was established at trial. Confusion might also take the form of reverse confusion, in which Defendants would appear to be the original manufacturer of MIRACLE products, and A & H would be viewed as the imitator. Victoria' Secret's advertising for THE MIRACLE BRA has stated, amongst other things, "There is only one miracle bra." This could imply that all other related products, including those of Plaintiffs are imitations. Women who believed that the MIRACLESUIT swimsuits primary feature is cleavage enhancement, would not buy the MIRACLESUIT for its controlling function. Defendants' extensive marketing with THE MIRACLE BRA has quite possibly effected Plaintiffs' use of MIRACLESUIT as a unique source-designator for Plaintiffs' swimsuits. A & H obviously has no control over the quality of the MIRACLE products marketed with MIRACLE and sold by Defendants. B. Waldman, 10/25/95, p. 132:4–10.

The incidents of actual confusion testified to at trial all followed the introduction of THE MIRACLE BRA bikini (Findings of Fact 71 and 72). A majority of these inci-

dents involved professional swimwear buyers who ordinarily are held to a higher standard of care. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 293 (3d Cir. 1991), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) ("reasonably prudent buyers" held to lower standard than professional buyers). The incidents testified to were attributable to Defendants' crossing the line between the lingerie and swimwear industries with their THE MIRACLE BRA mark. Those incidents as related to the Court apparently did confuse the maker of THE MIRACLE BRA with the manufacturer of the MIRACLESUIT. While the incidents testified to probably did occur, their second hand accounting must be carefully scrutinized. The potential to inflict substantial harm on a successful product line by uncorroborated if believable accounts compels us to be vigilant in holding the Plaintiff to its ultimate burden of proof.

Plaintiffs have not conclusively shown they have lost sales as a result of Victoria's Secret's use of its registered trademark, THE MIRACLE BRA, on bras or swimwear. However, an increase in sales of MIRACLESUIT alone does not convince us that sales were not lost to THE MIRACLE BRA products. Like the legendary fish that got away, so too such lost sales are largely unquantifiable. While there might also potentially be a countervailing increase in profitability based on consumers' mistaking the two lines of products to A & H's benefit, Plaintiffs have potentially greater concerns than lost sales including control of reputation of MIRACLESUIT swimsuits, loss of unique identity, and nullification of advertising by the presence of THE MIRACLE BRA in the swimwear market.

#### 7. Similarity of Marketing and Media Channels

While not in the exact same publications or retail locations, both Plaintiffs and Defendants market and promote their products through the same channels of trade and through the same media (Finding of Fact 43). Both products are sold in retail stores and in catalogues; both are marketed in national consumer magazines and trade publications; and both have been promoted on television (Findings of Fact 59, 60, 63–65). In some cases, advertisements for the two products appeared in the same publication, pages apart. Exhibit P–18T.

#### 8. Target Consumers

We next examine the extent to which the targets of the parties' sales efforts are the same. There is considerable overlap in the target customer pool with both apparently targeting the bulk of adult women consumers (Finding of Facts 38, 39). We can't help but observe, however, the most obvious consideration that target customers for THE MIRACLE BRA will be women who wish to purchase a bra while those of the MIRACLESUIT will consist of women looking for a swimsuit. While the age groups are similar, we fear this characterization may be so overbroad as to lose all meaning. If two companies target a customer base that consists of all adults, the very nature of the companies' products and the context in which purchases are made may sufficiently distinguish their customer base. For example, virtually all citizens would probably be considered target customers for both supermarkets and dry cleaners. However, the strikingly different context in which customers patronize these establishments—responding to different needs from an admittedly similar customer pool—render this factor of only limited utility. So too, although Plaintiffs and Defendants here claim to target similarly aged women, that similarity alone is not enough to make us forget that swimsuits and bras perform significantly different overall functions.

#### 9. Public Perception of the Relationship of the Goods

We turn next to the relationship of the goods in the minds of the public because of their similarity of function. This factor perhaps more readily addresses our concerns expressed in the previous factor. The parties have both stated that bras and swimsuits are closely-related (Finding of Fact 45). We believe however, that although related, swimwear and lingerie still comprise separate industries. Lingerie or intimate appar-

el includes bras, panties, sleepwear, robes, nightgowns and pajamas that women would wear underneath their clothing or in which to sleep. We do not believe that swimsuits (Plaintiffs' strongest arena) are intimate apparel (Defendants' domain). Especially from the viewpoint of the consumer, the overall functions of a bra and a swimsuit are distinct. One is predominantly an undergarment, designed solely to support a woman's chest, and worn virtually everyday. The other is a complete garment for a relatively limited purpose—swimming or water related activity (e.g. sunbathing, beach games). Swimwear and lingerie do frequently resemble each other. Many bras closely resemble swimsuits. Swimsuits incorporate bras into their design (Finding of Fact 45). Yet these facts alone are insufficient to show that *the public* equates the two products. Rather, we suspect it is the manufacturers and retailers, including the parties before us, who more readily appreciate the products' similarities. We can not conclude that because of their physical resemblance, the manner in which these two distinct products are sold would likely confuse a customer.

Defendants' assert THE MIRACLE BRA bikini is intended for women who wish to enhance their cleavage whereas MIRACLESUIT is for women wishing to slim their figure. At trial, A & H asserted that similarity in customers is based on: their willingness to pay a higher price (over $50) for a swimsuit; their similarity in age and their desire for a stylish swimsuit that shapes and contours comfortably. An article in *Women's Wear Daily* depicted women with varying body shapes—not just full figured—and the MIRACLESUIT product line's response to each. Exhibit P–18Q. THE MIRACLE BRA bikini is similarly not solely a cleavage enhancing garment as evidenced by the fact that its pads are removable. The garment is designed to provide an un-enhanced (standard) option, similar to most other swimsuits.

According to Defendants, a prospective purchaser considering a purchase from a catalogue typically has a picture—not the actual product—in front of her or him to examine. Fedus, 11/01/95, p. 202:25 to p. 203:4. The previous presence of Plaintiffs' MIRACLE-SUIT swimsuit in Defendants' Victoria's Secret Catalogue—displayed next to other swimsuits of various design and manufacture—underscores our belief that the MIRACLESUIT, even without a bust enhancing feature, is targeted to a consumer pool similar to Victoria's Secret products.

## 10. Other Factors

We finally consider other factors to suggest the public might expect Plaintiffs to manufacture a product in Defendants' market. Plaintiffs have had some limited involvement in the bra industry (Finding of Fact 13). However, none of these efforts was in conjunction with the MIRACLESUIT line of products. Neither have we seen any indication that the SWIMSHAPER mark frequently associated with MIRACLESUIT has had any connection with either of Plaintiffs' ventures in bra design and manufacture. Plaintiffs have not shown that the consuming public would expect A & H or Mainstream—neither of which companies' names appears in consumer advertising for swimwear, (B. Waldman, 10/25/95, pp. 140–143)—to manufacture products in the lingerie market.

## 11. Factor Summary

In summary, therefore, we hold that with respect to the likelihood of confusion between Plaintiff's MIRACLESUIT and Defendants' THE MIRACLE BRA, (1) the two marks are similar in that they share a dominant portion, the word "miracle", yet remain distinct by the addition of the word that follows (bra or suit) when designating those respective goods; (2) the marks are both strong in their respective industries which we believe are swimsuits for Plaintiffs MIRACLESUIT and lingerie for Defendants' THE MIRACLE BRA. As those marks extend into the industry dominated by the other (i.e. MIRACLESUIT for lingerie or THE MIRACLE BRA for swimwear), the strength of the marks and the amount of protection they receive commensurately decrease; (3) the goods are in different price categories; (4) the Defendants had used their THE MIRACLE BRA mark for slightly over one year prior to an incident of actual confusion. The few incidents occurred just two months

following Defendants' extension of THE MIRACLE BRA to swimwear, an industry in which Plaintiffs had already produced and registered their MIRACLESUIT for several years. Exhibit P–1; (5) based on the record before us, Defendants did not adopt its THE MIRACLE BRA mark with the conscious and deliberate bad faith intent to free-ride on the success of Plaintiffs' mark; (6) the evidence of actual confusion suggests it was Defendants' entry into swimwear rather than into the lingerie market with the name "miracle" that caused potential confusion among consumers; (7) the goods are marketed through the same media; (8) the products are marketed to women of similar age; (9) the goods serve different functions; and (10) the Plaintiffs' limited involvement in developing and manufacturing bras is not germane to our analysis where none of these efforts were conducted using marks or names at issue in this litigation. We therefore conclude that Plaintiffs have not met their burden under the *Scott Paper* standard and have not established a likelihood of confusion between their MIRACLESUIT swimsuit and Defendants' THE MIRACLE BRA (bra).

In their arguments before us, Plaintiffs have attempted to blur the distinction between the swimwear and lingerie industries by routinely pairing them together. To be sure, even Defendants have acknowledged that there is a close relation between bras and swimwear (Finding of Fact 45). We are aware of Plaintiffs' limited extension of the MIRACLESUIT name into other lines of apparel, even prior to this suit (Finding of Fact 4). Plaintiffs have also claimed they have used the MIRACLESUIT trademark on dresses, "short-shorts", and leotards. This extension was implemented although the MIRACLESUIT trademark was registered for use with swimwear. Other than the prototype dress made by A & H with a MIRACLESUIT sewn-in label, Plaintiffs offered *no evidence that short-shorts,* bike shorts, leotards or tank dresses bearing the MIRACLESUIT trademark have yet been offered for sale to the public. Plaintiffs' use of MIRACLESUIT on dresses arose after Plaintiffs were aware of Victoria's Secret's THE MIRACLE BRA and after the lawsuit had been filed. B. Waldman, 10/26/95, p.

147; p. 168–174; p. 191:11–22 and p. 191–193; Exhibit D–259.

It is perhaps not uncommon for a single tradename to be used both for lingerie and for swimwear (Finding of Fact 50). Defendants' THE MIRACLE BRA has followed a path previously tread by others. Neither that observation nor Plaintiffs' and Defendants' choice to brand extend their trademarks into products other than the one for which their respective trademarks were registered alters our belief that these uses are *separate and distinct.* A trademark owner's expansion of its use of its trademark into related fields, provided it does not conflict with the rights of a prior user of the same or a similar mark, does strengthen the owners rights. Defendants' themselves have similarly used their THE MIRACLE BRA mark on a wide range of goods, from a "control slip" to a "swimbody" and referred to expansion from bras to swimwear as a "natural extension" of their mark. While we may agree such extensions are natural and that the industries are related, Plaintiffs fail to convince us *that their efforts to expand prior to* bringing this action were sufficient to establish a real presence in non-swimwear industries, including lingerie. Neither do we believe that the parties—through either their actions in the marketplace or their arguments before us—have led us to believe these industries are one and the same.

### D. PENNSYLVANIA ANTIDILUTION LAW

▇ Plaintiffs have also asserted that Defendants' use of a mark containing MIRACLE for its goods constitutes a violation of Plaintiffs' rights under the Pennsylvania Antidilution law. The statute provides in its entirety:

*Likelihood* of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

54 Pa.C.S.A. § 1124 (emphasis added). We have concluded above that Plaintiffs have not shown a likelihood of confusion. Like the Court in *Nugget Distributors Co-op v. Mr. Nugget, Inc.*, 776 F.Supp. 1012, 1024 (E.D.Pa.1991), we believe that proof of predatory intent is relevant in establishing a claim under the Pennsylvania antidilution law. *See also Moore Push–Pin Co. v. Moore Business Forms, Inc.*, 678 F.Supp. 113, 117 (E.D.Pa.1987) (reviewing interpretations of a similar New York statute). As noted in factor 5 of the *Scott Paper* analysis, we have found no bad faith on the part of Defendants in adopting their mark. Without such proof, we find that Plaintiffs have additionally failed to show a violation by Defendants of the Pennsylvania statute.

## E. POSSIBILITY OF CONFUSION

Our conclusion that the *Scott Paper* standard for likelihood of confusion has not been met does not answer all issues raised by this litigation. Plaintiffs have also sought to enjoin Defendants' use of THE MIRACLE BRA with respect to swimsuits and other related products. Based on the record before us of Plaintiffs' limited extension of its MIRACLESUIT mark into non-swimwear products prior to their bringing this action (Finding of Fact 4), and the plain language of their trademark registration covering "swimwear in class 25," we do not believe Plaintiffs have met their burden of proof for these non-swimwear items.

With respect to Defendants' THE MIRACLE BRA swimwear and the Plaintiffs' MIRACLESUIT, we find the recent case of *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056 (3d Cir.1991) controlling. In that case, the Third Circuit held that where a party moved into the territory of an established concern, the "likelihood of confusion standard" should be lowered to a "possibility of confusion." *Id.*, at 1065. The *Country Floors* standard was more recently reaffirmed in *Merchant & Evans v. Roosevelt Bldg. Products*, 963 F.2d 628, 637 (3d Cir.1992) (when a newcomer uses a name or mark similar in some respect to that used by the established concern, "the 'likelihood of confusion standard' should be lowered to a 'possibility of confusion.' ").[10] Unlike the exhaustive and multi-factored analysis required by the *Scott Paper* case, a more focused inquiry is mandated with regard to our consideration of THE MIRACLE BRA bikini and other swimwear with respect to Plaintiff's MIRACLESUIT. We have concluded that by extending their THE MIRACLE BRA product line into the separate and distinct swimwear industry, Defendants' actions must be reviewed under this lesser alternative standard.[11] Specifically,

> This legal conclusion requires the district court to determine what market is relevant to the [plaintiff]'s claim that use of [contested name] violates § 43(a) of the Act. Thus, *if the possibility exists that the names ... will be confused, determination of the relevant market becomes especially important* on the [plaintiff's claim of tradename appropriation] in violation of § 43(a) of the Lanham Act by adopting a confusingly similar tradename.

*Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1065 (3d Cir.1991) (emphasis added). *See*

---

**10.** Overruling on other grounds recognized by *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1439 (3d Cir.1994) citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 770, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992).

**11.** Defendants urge us to analogize the possibility of confusion standard to the "second-comer" or "newcomer" doctrine as set forth in *Thompson Medical Co., Inc. v. Pfizer*, 753 F.2d 208, 214 (2d Cir.1985). That doctrine requires that a senior user's mark be highly distinctive and that a junior user be guilty of bad faith. However, the Third Circuit has not adopted such a test. Plaintiffs assert the "second-comer" or "newcomer"

doctrine is a creature of the Second Circuit. At least one Eastern District of Pennsylvania opinion appears to have accepted the existence of such a doctrine and reiterates its two elements. *Total Containment, Inc. v. Environ Products, Inc.*, 921 F.Supp. 1355 (E.D.Pa.1995) (Gawthrop, J.). That opinion notably does *not* equate the doctrine with the Third Circuit's "possibility of confusion" standard, incorporates the "second-comer" doctrine into the multi-factored analysis required by *Scott Paper*, and concludes that the Third Circuit has implicitly rejected the second-comer doctrine. *Total* at 1410–11. We are not persuaded that the doctrine is equivalent to the "possibility of confusion" standard set forth in *Country Floors* and its progeny.

*also Telechron, Inc. v. Telicon Corp.*, 198 F.2d 903, 908–909 (3d Cir.1952); *Dominion Bankshares Corp. v. Devon Holding Co., Inc.*, 690 F.Supp. 338, 345 (E.D.Pa.1988); *Blumenfeld Development v. Carnival Cruise Lines*, 669 F.Supp. 1297, 1319 (E.D.Pa.1987); *Barre–National, Inc. v. Barr Laboratories, Inc.*, 773 F.Supp. 735, 740 (D.N.J.1991) (meaning of "field" important in determining which standard is appropriate).

In a telephonic conference on the record on May 7, 1996, the parties agreed through their respective counsel that the Court should consider this doctrine and that Plaintiffs' complaint would be deemed amended to include this as an alternate theory for relief. The Court gave the parties an opportunity to respond and be heard with regard to this doctrine by letter briefs.

*1. Relevant Market*

We begin our analysis of the relevant market with an eye toward its composition. "Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2nd Cir.1996). A review of our prior discussion under *Scott Paper* leads us to believe that as to class of customers, manner of advertising, and sales channels there is a similar relevant market for the swimwear products.

We are aware that Plaintiffs' MIRACLE-SUIT and many of THE MIRACLE BRA swimsuits are not identical (the one emphasizing control and the other predominantly emphasizing enhanced cleavage). Nevertheless numerous courts have found products with differences significantly greater than those at issue here capable of causing confusion in the minds of consumers. In *International Kennel Club v. Mighty Star, Inc.*, 846 F.2d 1079 (7th Cir.1988), the court rejected the assertion that a party whose business primarily involved the promotion and sponsoring of dog shows was engaged in a totally different business than one who merely sold toy stuffed dogs and who used different channels of trade and advertising media.

> "[T]he defendants argue that the differences in the parties' businesses weigh against the possibility of consumer confusion. The defendants fail to persuade us that these differences are dispositive: we have specifically noted that *a plaintiff need not demonstrate that it is in direct competition with an alleged infringer in order to establish likelihood of confusion.*"

*Id.*, 846 F.2d at 1089 (emphasis added).

The Second Circuit has made similar conclusions about different but related products. In *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126 (2nd Cir.1979),[12] the court stated:

> Customers shopping for an inexpensive golf jacket are not likely to become confused by the similarity of the marks and mistakenly purchase a fashionable and expensive woman's coat. Thus the degree of proximity between the two products is relevant here primarily insofar as it bears on the likelihood that customers may be confused as to the *source* of the products, rather than as to the products themselves, and the concern is not direct diversion of purchasers but indirect harm through loss of goodwill or tarnishment of reputation.

*Id.*, 599 F.2d at 1134 (emphasis in original). The court concluded:

> The impression that noncompeting goods are from the same origin may be conveyed by such differing considerations as the physical attributes of the goods, with specific reference to their form, composition, texture or quality, the service or function for which they are intended, the manner in which they are advertised, displayed or sold, the place where they are sold, or the class of customers for whom they are designed and to whom they are sold.

*Id.*, at 1135 (citation omitted). Again these factors suggest a similar relevant market for the MIRACLESUIT and THE MIRACLE BRA swimwear. Both are swimsuits with varying functions; both are advertised in national magazines and catalogues; both are

---

**12.** Superseded by rule as stated in *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2nd Cir.1992) as to issue of de novo review by appellate court.

sold through catalogues and retail stores; and both target adult women in the "premium" swimsuit market.

We do not believe Victoria's Secret's THE MIRACLE BRA line alone constitutes the relevant market for the product. As the court stated in *Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (9th Cir.1970), "We have been directed to no case in which one manufacturer's line of products was held to be so unique that it could be deemed a distinct line of commerce." *Id.*, at 1344. Four years later, the same court addressed similar issues in *Redken Laboratories, Inc. v. Clairol, Inc.*, 501 F.2d 1403, 1404 (9th Cir.1974). There they observed that competing hair-care products were both sold primarily in the beauty-salon trade, and during the relevant times, one of the products was also sold in retail stores while the other rarely found its way into the retail market. Specifically they noted:

> [T]here is nothing to prevent [plaintiff] from marketing [its product] in the future through the same retail channels used by Defendant for [its product]. [Plaintiff's] trademark registration is not so limited, nor would anything inherent in the product effectively prohibit retail distribution. Therefore, although both the Board and the district court defined the relevant market as the beauty salon trade, we will include a potential retail market in our analysis of the problem of likelihood of confusion.

*Redken Laboratories, Inc. v. Clairol, Inc.*, 501 F.2d 1403, 1404 (9th Cir.1974). *See also Vitarroz v. Borden, Inc.*, 644 F.2d 960, 967 (2nd Cir.1981); *Barre–National, Inc. v. Barr Laboratories, Inc.*, 773 F.Supp. 735, 740 (D.N.J.1991) (acknowledging a market area of liquid pharmaceuticals would require court to construe the concept of "field" far too narrowly); *H.W. Carter & Sons, Inc. v. William Carter Co.*, 913 F.Supp. 796 (S.D.N.Y. 1996) (fact that registration was limited to five specific categories of clothes and made no reference to children's apparel did not mean it did not cover children's clothing).

In light of these precedents, we believe the most reasonable reading of Plaintiffs' MIRACLESUIT registration is that, "precisely because it contained no limitations as to size, age, gender, or intended purpose, it covered the items of clothing in question without regard to size, gender, age, or intended purpose." *H.W. Carter & Sons*, 913 F.Supp. 796, 803. While we agree Plaintiffs' MIRACLESUIT mark should be protected in the area covered by its registration, namely "swimwear in class 25" (Exhibit P–1), we do not believe that that protection is automatically warranted beyond the swimwear category, especially in light of Plaintiffs' limited ventures into the non-swimwear markets prior to the introduction of Defendants' THE MIRACLE BRA.

### 2. Movement by Newcomers

■ Having established the relevant market and territory, we have little difficulty in finding that the Defendants are relative newcomers to the swimwear industry. Plaintiffs registered and marketed their MIRACLESUIT prior to any relevant action by Defendants in the swimwear market (Findings of Fact 1, 21, 25, 32–34). We also find that Defendants' activities amounted to a movement into a territory already occupied by Plaintiffs. *See Merchant & Evans v. Roosevelt Bldg. Products* 963 F.2d 628, 637 (3d Cir.1992).

### 3. Other Factors

■ In *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189 (3d Cir. 1995), the Third Circuit recently again noted the likelihood standard has been relaxed to a possibility standard in some cases. *Versa* at 200. The Court pointed out that "[t]hese cases have all involved actions for trade*mark* or trade*name* infringement, not trade dress, and certainly not trade dress alleged in a product infringement." *Id.*, (emphasis in original). Because *Versa* addressed "whether the 'possibility of confusion' standard should govern product configuration trade dress cases," its holdings are binding only to trade dress cases. *Id.* Nonetheless, Judge Becker went on to consider the underlying rationale of the "possibility of confusion" cases. Since this underlying rationale was not discussed thoroughly by *Country Floors, Inc. v. A Partnership Composed of Gepner*

*and Ford,* 930 F.2d 1056 (3d Cir.1991) or *Merchant & Evans v. Roosevelt Bldg. Products,* 963 F.2d 628, 637 (3d Cir.1992), we will review the *Versa* Court's analysis here.

In *Versa,* Judge Becker noted that the Court previously had

emphasized the strong aural similarity of the marks and the evidence of actual confusion, concluding that the evidence was adequate substantiation of tendency to confusion inherent in the obvious similarity of the words themselves. Only then, *expressly as an additional consideration,* did we observe that this was a type of case where a court properly requires the second comer to stay clearly away from the original mark, and thus that any possible doubt of the likelihood of damage should be resolved in favor of the first user.

*Versa* at 200, citing *Telechron, Inc. v. Telicon Corp.,* 198 F.2d 903 (3d Cir.1952), (emphasis added). In product configuration trade dress cases, the greater the length of time for the public to come to associate a configuration with an earlier user, the greater the risk of misleading consumers. The *Versa* Court nevertheless concluded that that concern alone is insufficient for lowering the measure of confusion required to make out a Lanham Act violation. "Rather, it is at most a factor properly taken into account in assessing the likelihood of confusion." *Versa* at 201. *Versa* states that the trademark "possibility of confusion" standard must be supported by other considerations. "We believe that the primary reasons for lowering the measure of confusion when a newcomer copies an established trademark are the general lack of legitimate reasons for copying a competitor's mark ... and the high degree of reliance by consumers on trademarks as indicators of the source of products." *Id.*

We believe the *Versa* Court's instruction to consider the high degree of reliance by consumers on trademarks is more accurately a fixed observation than a starting point for further analysis. There is little reason to conclude this observation is any more or less relevant to the facts in our case. We have little doubt that consumers of lingerie and swimwear also rely on trademarks as indicators of product source.

With regard to legitimacy, Defendants argue that the extension of their mark into swimwear was legitimate because the THE MIRACLE BRA mark had already attained a level of public awareness "so pervasive as to have entered our national consciousness." Letter Brief to the Court of May 10, 1996, p. 5. They go on to assert that "THE MIRACLE BRA swimwear is consistent with the image of THE MIRACLE BRA because the swimwear has the unique, padded, push-up feature of THE MIRACLE BRA. Hence it represents a natural extension of the line." *Id.,* p. 8. Defendants also state that this expansion "was intended solely to capitalize on the good will and recognition which Victoria's Secret had built up with the phenomenal success of THE MIRACLE BRA." Letter Brief to the Court of May 13, 1996, p. 3.

We have found with regard to THE MIRACLE BRA (bra), that bad faith and deliberate intent to capitalize on Plaintiffs' success with the MIRACLESUIT mark are not present. With regard to their extension of this mark into swimwear, Defendants had constructive notice from the trademark register and actual notice from their trademark searches of Plaintiffs' mark in the swimwear industry. We nevertheless do not believe for these reasons alone that Defendants' choice to extend THE MIRACLE BRA to swimwear was illegitimate for purposes of the Lanham Act and the "possibility of confusion" standard. *See Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 471 (3d Cir.1990) citing *Andy Warhol Enterprises, Inc. v. Time Inc.,* 700 F.Supp. 760, 766 (S.D.N.Y.1988) ("continuing use of trademark after notification not sufficient for finding of bad faith"); *Information Clearing House v. Find Magazine,* 492 F.Supp. 147, 161 (S.D.N.Y.1980) (where Defendants relied on advice of counsel, *even if wrong,* record insufficient to find Defendants liable for "that species of bad faith which constitutes independent and substantive proof of infringement.").

In summary, bad faith and illegitimacy have not been shown. It would also appear that if illegitimacy is needed to support the "possibility of confusion" standard in the trademark or tradename context, then a pos-

sibility of confusion has not been proven. We respectfully note that *Versa* is not an en banc opinion of the Third Circuit and should not be viewed as overruling *Country Floors* and *Merchant & Evans.* Third Circuit Internal Operating Procedure 9.1. We further believe from the introductory language of *Versa* that it is limited to the trade dress product configuration context. We therefore believe that Plaintiffs have established a possibility (though not a likelihood) of confusion in the record before us.

## IV. POST–TRIAL MOTIONS

Various motions and correspondence were filed after trial on the issue of liability had concluded. We dispense with those motions we have not yet addressed as follows:

1. Plaintiff's motion to require Defendants to produce writings including opinions of counsel regarding the validity or availability of the designation "THE MIRACLE BRA" as a trademark for any goods or services whatsoever, filed January 18, 1996, is DENIED. We do not believe that Defendants have waived their attorney-client and work product privileges in their post trial memorandum. We further DENY Plaintiffs' request to admit opposition papers filed by Defendants against Plaintiffs' proposed registration of MAGIC BRA. We believe that consideration of the MAGIC BRA is not germane to the strength of the "miracle" marks in issue here. Even if it were, our above Finding of Fact 45 that swimwear and lingerie products are related makes further analysis of this question moot.

2. Defendants' motion to strike the declaration of Arthur H. Seidel, Esq. which accompanied Plaintiffs' reply papers, filed February 27, 1996, is DENIED as moot. We do not consider the *In re: Ronco Teleproducts, Inc.* decision by the Trademark Trial and Appeal Board, at issue in this motion, as either controlling or persuasive authority here.

3. We deem correspondence from counsel, filed by the Court May 8, 1996, regarding the recent decision *International Star Class Yacht Racing Ass'n v. Hilfiger, U.S.A.,* 80 F.3d 749 (2d Cir.1996) a motion for a finding of bad faith on the part of either VS Stores or VS Catalogue in adopting their mark THE MIRACLE BRA. We DENY this motion consistent with our above Findings of Fact Nos. 23, 27–30 and discussion under factor 5 of the *Scott Paper* analysis.

## V. CONCLUSIONS OF LAW

Consistent with the foregoing findings of fact and discussion, we state the following conclusions of law pursuant to F.R.Civ.P. 52(a):

1. Plaintiffs have not met their burden of establishing a likelihood of confusion under the applicable legal doctrines summarized in *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3d Cir.1978) and its progeny.

2. Defendants did not adopt their mark THE MIRACLE BRA in bad faith, with predatory intent, or for illegitimate reasons.

3. Proof of predatory intent is relevant under the Pennsylvania Antidilution statute, 54 Pa.C.S.A. § 1124.

4. Defendants have not violated the Pennsylvania Antidilution statute, 54 Pa. C.S.A. § 1124.

5. Illegitimacy is not an element of the "possibility of confusion" standard in the trademark or tradename context.

5. Plaintiffs have met their burden of establishing a possibility of confusion under *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford,* 930 F.2d 1056 (3d Cir.1991) and *Merchant & Evans v. Roosevelt Bldg. Products,* 963 F.2d 628, 637 (3d Cir.1992) with regard to the THE MIRACLE BRA trademark and the MIRACLESUIT trademark as applied to the swimwear market.

6. Plaintiffs are entitled to judgment in their favor. However, the issue of appropriate relief and damages (if any) remains to be determined.

An appropriate order follows.

### ORDER

AND NOW, this 24th day of May, 1996, with regard to post-trial motions as set forth

in part IV of the foregoing decision, it is hereby ORDERED as follows:

1. Plaintiffs' motion to require Defendants to produce writings including opinions of counsel regarding the validity or availability of the designation "THE MIRACLE BRA" as a trademark for any goods or services whatsoever, filed January 18, 1996, is DENIED.

2. Defendants' motion to strike the declaration of Arthur H. Seidel, Esq. which accompanied Plaintiffs' reply papers, filed February 27, 1996, is DENIED as moot.

3. We DENY Plaintiffs' motion for a finding of bad faith consistent with our Findings of Fact Nos. 23, 27–30 and discussion under factor 5 of the *Scott Paper* analysis.

It is hereby FURTHER ORDERED, consistent with the foregoing decision, as follows:

4. We find in favor of Plaintiff with regard to claims of Possibility of Confusion with regard to the THE MIRACLE BRA trademark and the MIRACLESUIT trademark as applied to the swimwear market.

5. We find in favor of Defendants with regard to all other claims for liability including Likelihood of Confusion and the Pennsylvania Antidilution statute, 54 Pa.C.S.A. § 1124.

## Appendix to Decision

Look ten pounds lighter in 10 seconds
The ten seconds it takes to slip it on

*Miraclesuit.*    Patent Pending

Look 10 pounds lighter in 10 seconds

VICTORIA'S SECRET

